[639 NYS2d 329]

HERBERT H. POST & CO., Appellant-Respondent, v SIDNEY BITTERMAN, INC., et al., Respondents-Appellants.

SIDNEY BITTERMAN, INC., et al., Respondents-Appellants, v HERBERT H. POST & CO. et al., Appellants-Respondents.

First Department, March 12, 1996

### APPEARANCES OF COUNSEL

*Robert E. Kushner* of counsel *(Stephen F. Willig* and *Peter A. Stroili* on the brief; *D'Amato & Lynch,* attorneys), for Herbert H. Post & Co. and another, appellants-respondents.

*Helen Davis Chaitman* of counsel *(Kelly J.B. Elvin* on the brief; *Ross & Hardies,* attorneys), for respondents-appellants.

*Edward R. Epstein* for Lawrence Klein, appellant-respondent.

### OPINION OF THE COURT

SULLIVAN, J. P.

This is an appeal by a certified public accounting firm, Herbert H. Post & Co., and its principal, Herbert H. Post (collectively, Post), charged by Sidney Bitterman, Inc., and Split End, Ltd. (the companies) and their principal owners, Leonard Bitterman and Caroline Bitterman (collectively, plaintiffs), in two actions, tried jointly, with a failure to discover an employee embezzlement. After a 28-day trial, a jury rendered a $17,063,069 verdict in favor of the companies and the Bittermans for Post's alleged failure to discover the loss. The trial court subsequently remitted the jury's award to $5,923,069, which included damages of $3,063,069 to the companies, less a setoff of $250,000, and $2,860,000 to the Bittermans personally. Lawrence Klein, a Post employee, charged along with the faithless Bitterman company employee of diverting fabric from the

companies to manufacture garments for their own account, also appeals from a damage award of $325,000 against him in favor of the companies. The jury also rendered a punitive damage award against Klein in the sum of $1,000,000, which the trial court reduced to $100,000, subject to a stipulation of acceptance. The companies and Bittermans cross-appeal, *inter alia*, from the award reductions.

The companies, founded in 1932 by Sidney Bitterman, Leonard Bitterman's father, were importers, primarily from the Far East, of ladies' outerwear. After Sidney's death, Caroline, his widow, became president and Leonard, his son, served as vice-president of the companies until their liquidation in early 1991. They were the sole owners, coequal officers and directors of Sidney Bitterman, Inc. Leonard owned $63^{1}/_{2}\%$ and Caroline 1% of Split End, Ltd., with other family members owning the remaining shares. Leonard and Caroline were Split End's only officers and constituted two of its three directors as of March 1988, although previously they were its only directors. Leonard devoted all of his time to the sales aspect of the business. Caroline was in charge of credit. Only they were authorized to sign company checks.

Manufacturers Hanover Trust Company (MHT) financed the companies' business, and, in 1976, on MHT's recommendation, Leonard retained Post to do the auditing and accounting for the companies. Thereafter and up until February 1988, when Leonard discharged Post, Post prepared year-end audited financial statements for the companies and two interim financial statements each year, as well as the personal tax returns for the Bittermans.

In 1982, the Bittermans turned the management of the companies' import department over to Richard Hecker, an apparently loyal employee, who, unbeknownst to the Bittermans, was a compulsive gambler. Beginning in mid-1983, Hecker, according to plaintiffs, embarked upon a scheme by which, over a four-year period until mid-1987, he embezzled $3,063,069 from the companies by having the Bittermans sign checks made out to allegedly fictitious freight forwarders, which checks he then had cashed at a Jersey City check-cashing service. Hecker would initially obtain the checks from a company clerk, supplying the name of the payee and amount but, in violation of established company procedure, without submitting a supporting invoice, which he promised to furnish later. The check would then be presented for signature to Leonard or Caroline, who, in 1983, was 79 years of age. In all, 366 checks were

involved; Leonard's signature appears on 60 checks totalling $572,599. He claims that his signature was forged on 13 of these checks.

According to plaintiffs, the effects of Hecker's embezzlement were apparent almost immediately. As of 1983, the companies had annual sales in excess of $43 million, with a gross profit of $8.8 million and net income of $577,550. By 1985, however, the companies were suffering an operating loss of $1.6 million, which, in 1986, increased to $3.1 million with a net loss of $2.7 million. In 1987, the year the embezzlement was discovered, the companies suffered an operating loss of $1.5 million and a net loss of $3.3 million. In fact, in Post's report on the companies' March 31, 1987 audited financial statement, it noted that "current liabilities exceed current assets by $2,351,244 and total liabilities exceed total assets by $1,722,827. These factors indicate that the Company may be unable to continue in existence." These losses prompted MHT, beginning in 1985 and continuing until the companies' liquidation, to reduce available credit drastically. The companies' loan was as high as $21.2 million in 1983. By the end of 1986, it had been reduced to $12,987,000. By January 30, 1991, at the time of their liquidation, the debt was down to $7,136,000.*

Even more dramatic was MHT's reduction in the availability of letters of credit to cover inventory purchases. In 1983, the companies had over $9.8 million outstanding in letters of credit; by June 1985, they had less than $5 million at their high point. By year's end that figure had been reduced to $1 million. For each of the first three months of 1986, the companies' outstanding letters of credit totalled less than $750,000. As the testimony shows, the companies' sales and profits were related directly to their ability to obtain letters of credit.

Another factor which contributed to MHT's dissatisfaction with the loan was, according to a November 24, 1987 internal memorandum, management's inability to identify and reduce "sundry receivables", which had grown to $2 million. The record shows that Post had instructed the companies' bookkeepers to enter checks payable to freight forwarders for which there was no supporting invoice as sundry receivables. These checks were a substantial component of the $1.5 million in sundry receivables shown on the companies' March 31, 1986

* In 1991, the Bittermans and the companies agreed to fund this lawsuit and to allocate 70 to 75% of the proceeds thereof to MHT to satisfy the companies' $5 million postliquidation debt to MHT.

financial statement. In answer to the inquiry of a MHT loan officer, Post accountants told him that the sundry receivables were advance payments to overseas suppliers, a statement without basis in fact. Post's accountants also reclassified $800,000 to $900,000 of these checks to "officers' loans". These open loans, as the record shows, adversely affected the companies' ability to obtain letters of credit.

In late August or early September 1987, MHT agreed to issue a $2.5 million letter of credit, which the companies needed for a fall line, provided that debt reductions continued, and Leonard Bitterman pledged $200,000 in collateral, which was ultimately used to reduce the MHT debt, in addition to the $1 million in collateral already pledged. To secure his personal guarantee and the companies' loans, Leonard Bitterman had pledged his house and given a second mortgage on a warehouse. MHT continued financing at a subsistence level only until the companies could obtain other financing. When the companies could not find another lender by the end of 1988, MHT agreed to continue financing, extending a reduced line of credit and requiring Leonard Bitterman to put up additional collateral. Ultimately, according to plaintiffs, the reduced credit placed a stranglehold on the companies' ability to obtain letters of credit and impaired their ability to generate income. They were forced to close at the end of 1990.

Lawrence Klein, a Post employee assigned to the companies' account, in January 1986, at the request of Hecker, who already had a garment business "on the side", formed a corporation called Gotcha Covered Up (GCU), which imported finished garments manufactured in the Philippines. Klein's duties, for which he received a 5% interest in GCU, included the preparation of projections and accounting and bookkeeping functions. He was not involved in the production or sale of the garments, but did write checks on the business account. Although Klein claimed a total compensation from GCU in 1986 and 1987 of only $38,000, over $300,000 in GCU checks were either made payable to him, cashed by him or used to pay his personal expenses such as mortgage payments and clothing purchases. Klein personally cashed over $200,000 in GCU checks. He ultimately repaid the sums he took to pay for personal expenses.

Beginning in August 1985, Hecker began to divert, for his own use and later GCU's, denim fabric owned by the companies and stored in the Philippines at their fabricator's plant. With the complicity of an employee there, Hecker arranged to have

the fabric cut and sewn into finished garments and shipped to him and later GCU, charging labor and freight costs to the companies. GCU's business was operated from the companies' offices without ever paying any of the overhead or even shipping costs. Hecker, together with other Bitterman company salesmen, sold denim garments, including jeans, for GCU to the companies' customers. Klein testified that he had no knowledge that any of the companies' funds or fabric were being used by GCU.

In July 1987, after the sundry receivables had grown to nearly $1.5 million, MHT became concerned and sent an auditor to examine the companies' books. He discovered Hecker's embezzlement scheme and reported it to Leonard Bitterman, who immediately confronted Hecker and fired him. After an FBI investigation, Hecker was indicted and pleaded guilty to embezzlement in a Federal court. In his plea allocution, Hecker implicated Leonard Bitterman:

"Q. All right, will you explain to me in your own words what it is you did, and how you violated the law?

"A. I had an agreement with Claude Notar, Gene Goldstein and Leonard Bitterman to issue checks to fictitious employees in order to channel funds back into the companies for which I worked for at the time, Sidney Bitterman, Inc. and Split End Ltd. Some of proceeds I did get myself. That is the gist of it.
* * *

"[The prosecutor]: Additionally I would just ask the approximate value of the fraudulent checks that were issued.

"THE DEFENDANT: It was approximately $1.7 million in checks issued, some of which I did process myself.

"Q. And what was that amount?

"A. Approximately five to $600,000 in my own best recollections."

In charging Post with malpractice in not detecting Hecker's embezzlement, plaintiffs allege that it failed to have quality control standards; did not have a written audit plan; failed to confirm accounts receivable or sundry receivables as well as officers' loans and failed to inspect physically the companies' overseas inventory.

Post's defense to the malpractice claim was based largely on Leonard Bitterman's knowledge of and complicity in the alleged fraudulent check scheme, a defense which rested upon the premise that it did discover the issuance of checks for which there was no proper documentation at an early stage

and brought it to the attention of Leonard Bitterman and Hecker. On the basis of the latters' explanation that the checks were used to pay for under-billing for imports and for Bitterman's own needs, Post insisted that the transactions be reclassified on the books and 1984 financial statements from freight expense to "loan receivable—shareholder", referring to Leonard Bitterman. After voicing strong objection, Bitterman, although maintaining at trial that he never received an explanation from his accountants as to why he owed the money, did, in fact, over a period of two years, repay $811,000, the total amount involved in the fraudulent check scheme in the years 1983 and 1984.

Plaintiffs claimed that the alleged embezzlement, which ended in 1987, caused the demise of the companies in late 1990 and that, as a result, the Bittermans personally lost $2,800,000 in collateral, which was used by MHT to reduce the companies' debt. Although initially rejecting the Bittermans' personal damage claim as speculative, the trial court eventually permitted the issue to be submitted to the jury. In this regard, as noted, there was evidence that the companies were in financial trouble for the entire four years after Hecker's embezzlement was discovered and during the three years before that for reasons other than the embezzlement. Thus, during the three-year period ending March 31, 1987, the companies sustained total losses of $7,000,000, of which only a portion could be attributable to the defalcation. When MHT placed the companies on its credit surveillance list in 1986, it explained that "[i]nventory has been carried at excessive levels as sales declined for both 1985 and 1986."

The troubled financial state of the companies continued during the 3½-year period after the Hecker defalcation was discovered. As the testimony reflects, the companies were plagued by problems unrelated to the defalcation: "Inventory accumulation, gross margin deterioration, receivable returns, inventory returns. Just their presence in the marketplace declined, their name in the market—a host of problems". As early as 1988, the companies were "extremely overleveraged", having borrowed $15 million more than their equity. Due to operating problems, they were unable to repay their huge debt in the years after the defalcation had terminated. They suffered operating losses in two of those three years, fiscal 1989 and 1990, and showed only a small profit in 1988.

The trial court submitted to the jury a special verdict sheet which, with respect to the cause of action for malpractice

against Post, posed the following questions: "3 (a). Did [Post] depart from accepted standards of accounting practice in rendering its services to the Bitterman companies from 1983 onwards?" Post objected, contending that a departure was not, by itself, negligence. The objection was overruled. By a vote of 5 to 1, the jury answered "yes" to the question. "3 (b). Was this departure a substantial factor in causing the injuries sustained by the Bitterman companies and/or the Bittermans?" No objection was raised to this question. The jury answered "yes". "7. Please state the dollar amount of damages sustained by the Bitterman companies as a result of Rick Hecker's embezzlement." Post's objection to this interrogatory, as foreclosing Post's defense that it was Leonard Bitterman's scheme, not Hecker's, was overruled.

The jury awarded the companies $3,063,069 in damages, finding them free from fault.

The special verdict sheet also asked: "8. Please state the dollar amount of damages sustained by the Bittermans, personally, due to the failures of their business." Post objected that the interrogatory did not require a finding of causation but was overruled. The jury found for the Bittermans in the sum of $12,500,000. Subsequently, during argument of the postverdict motion, the court acknowledged its failure to include a "specific proximate cause question on the verdict sheet" with regard to the Bittermans' claim for personal damages but concluded that its over-all charge was adequate to apprise the jury of the need for a direct causal relationship between any malpractice and damages. The court denied the motion to set aside the verdict but, as noted, reduced the Bittermans' personal damage award to $2,860,000.

Also denied, *sub silentio*, was Post's request for a reduction in the verdict by the amounts recovered by the companies from two intermediaries to the check cashers, who paid $139,000, and two of the freight forwarders, which paid $39,000. The judgment did not provide for such relief, contravening the court's assurance to the jury that "[a]ny award by you for the Bitterman Companies will be reduced by the amounts recovered by these companies in those actions."

The jury also found Klein liable for a breach of fiduciary duty by virtue of his involvement with GCU and assessed his liability at 65% with respect to an award of $500,000 in damages. The jury also awarded $1 million in punitive damages against Klein, which award the court, as noted, reduced to $100,000. These appeals followed.

▊ At the outset, Post challenges the trial court's charge and special verdict sheet on negligence and proximate cause. Insofar as interrogatory 3 (a) is concerned, contrary to Post's arguments, the court properly asked the jury to determine whether Post had departed from accepted standards of accounting practice in rendering its services to the companies. "A claim of professional negligence requires proof that there was a departure from the accepted standards of practice and that the departure was a proximate cause of the injury." (*Georgetti v United Hosp. Med. Ctr.*, 204 AD2d 271, 272.) The negligence must be shown to be the cause of the event that produced the harm. (*Sheehan v City of New York*, 40 NY2d 496, 501.) Proof of proximate causation is an essential element of any malpractice claim, including accountant's malpractice. (*See, Geotel, Inc. v Wallace*, 162 AD2d 166, 168, *lv dismissed in part and denied in part* 76 NY2d 917.)

In that regard, the court failed to include an interrogatory on proximate cause with respect to the Bittermans' claim for personal damages. Interrogatory 8 merely called upon the jury to "[p]lease state the dollar amount of damages sustained by the Bittermans, personally, due to the failures of their business." Neither in interrogatory 8 nor anywhere else in the special verdict sheet was the jury asked whether the Bittermans' alleged personal damages, which, it should be noted, were never explained to the jury, were proximately caused by Post's negligence. Nor was interrogatory 3 (b), which asked whether Post's "departure [was] a substantial factor in causing the injuries sustained by the Bitterman companies and/or the Bittermans", an adequate substitute.

The inclusion of the words "and/or" to refer to the proximate cause of the injuries to both the companies and the Bittermans personally improperly joined two completely separate jury determinations within the same inquiry, each with its own peculiar considerations, and rendered the jury's affirmative response to the question, as one court observed, "indefinite, uncertain and unintelligible". (*California Shipbuilding Corp. v Industrial Acc. Commn.*, 85 Cal App 2d 435, 436, 193 P2d 61, 62.) The use of "and/or" has been roundly condemned as a "deliberate amphibology, susceptible of more than one interpretation and * * * a purposefully ambiguous expression, useful in its self-evident equivocality" (*In re Marriage of Lima*, 265 Ill App 3d 753, 757, 638 NE2d 1186, 1189). As a result of interrogatory 3 (b)'s use of "and/or" and the jury's affirmative response thereto, it is impossible to discern whether the jury found that

Post's departure from the accepted standards of accounting practice proximately caused injuries to the companies only, to the Bittermans only or to both. Where, as here, the answer to a question posed in a special verdict sheet is subject to multiple conclusions, New York courts will not engage in conjecture as to which of several possible findings the jury made. (*See, Pfeil v Elkcom Co.*, 51 AD2d 553, 554.) Since no exception was taken to interrogatory 3 (b), it does not, however, provide an independent basis for reversal.

Since interrogatory 8 asked the jury to determine the damages sustained by the Bittermans personally without apprising it of the need to find proximate cause and interrogatory 3 (b) only confused the issue, the verdict sheet in that respect was fatally defective. In that regard, we note, too, that the charge never explained what was meant by personal losses and never distinguished such losses from those allegedly suffered by the Bitterman companies as a result of the embezzlement. Proximate cause was explained only as an abstract definition completely divorced from the facts and in the context of a summary of the elements of a negligence claim. The court's failure to instruct properly on proximate causation specifically in the context of the Bittermans' personal claims, coupled with the defective verdict sheet on this issue, as well as its failure to explain the nature of the personal losses for which the Bittermans were seeking recovery, requires reversal as to the award in their favor. (*See, e.g., Booth v J. C. Penney Co.*, 169 AD2d 663, 665; *Mount Vernon Fire Ins. Co. v Trans World Maintenance Serv.*, 169 AD2d 519, 520; *Sard v Berman*, 47 AD2d 892.)

■ While it is further argued that the evidence was insufficient to sustain the Bittermans' claim for personal damages, we do not believe that, on this record, dismissal of the claim is warranted for failure to prove proximate cause. It is well settled that a plaintiff must establish, beyond the point of speculation and conjecture, a causal connection between its losses and the defendant's actions. (*Zarin v Reid & Priest*, 184 AD2d 385, 387-388; *Brown v Samalin & Bock*, 168 AD2d 531, 532.) Thus, the Bittermans had to show that " 'but for' [Post's] alleged malpractice, [they] would not have sustained some actual ascertainable damages." (*Franklin v Winard*, 199 AD2d 220, 221.)

Post offered substantial documentary evidence and testimony at trial demonstrating that the companies failed as a result of Leonard Bitterman's own mismanagement and the companies' continuing operating losses during the years in question, losses

which far exceeded the amount attributable to the defalcation and which resulted in the companies' inability to generate sufficient profit to pay off their loan obligations with MHT or to find a replacement lender. Nevertheless, there is an issue discernible as to whether it was reasonably foreseeable and a natural result of the risk created by Post's failure to detect Hecker's embezzlement that, notwithstanding these other factors, the companies would be so financially weakened by the embezzlement that they could not withstand normal business vicissitudes and would be forced to liquidate, thereby jeopardizing the Bittermans' collateral. (*See*, *Derdiarian v Felix Contr. Corp.*, 51 NY2d 308.)

While the general rule is that a shareholder lacks standing to sue for an injury to the corporation even though he "loses the value of his investment or incurs personal liability in an effort to maintain the solvency of the corporation" (*Abrams v Donati*, 66 NY2d 951, 953), an exception to the rule exists "when the wrongdoer has breached a duty owed to the shareholder independent of any duty owing to the corporation wronged" (*supra,* at 953). Post owed an independent duty to the Bittermans because of its professional relationship to them. Retained at the recommendation of MHT in 1976 by the companies and the Bittermans to do the audited financial statements for the companies and to prepare tax returns for the companies and the Bittermans, Post provided tax and financial advice to the Bittermans individually as well as prepared their tax returns. In 1981, Post recommended that the Bittermans change the companies' tax status from subchapter "S" to "C", as a result of which the companies' income was no longer directly taxable to the Bittermans. To ease the tax burden as a result of this change, Post recommended that the Bittermans purchase certain tax shelter investments. Acting simultaneously as accountant and tax advisor to the companies and the Bittermans, Post's duties overlapped. Moreover, the Bittermans were the companies to all intents and purposes. Post was their accountant personally as well as in a business capacity. In such circumstances, Post owed the Bittermans a fiduciary duty independent of the duty owed to the companies. Of course, the Bittermans may not recover the value of their investment in the companies since, as is evident from plaintiffs' cross appeal, this claim is being pursued by the companies and there cannot be a duplication of damages.

Nor may the $3,063,069 verdict in favor of the companies stand since, on the basis of evidence, it was against the weight

of the evidence (*see*, CPLR 4404 [a]). At trial, copies of the checks allegedly drawn to embezzle the companies' funds were admitted, over objection, in bulk, in five binders accompanied by a chart, prepared by counsel, at the front of each binder. They were admitted through the testimony of Terri Clementi, an assistant bookkeeper for the companies, who had nothing to do with selecting the checks or preparing the charts and was not familiar with the checks, their payees or whether Hecker, in fact, had requested them.

In addition, no explanation was offered to explain the absence of the originals of all the checks for 1983, 1984 and the first half of 1985. While plaintiffs' counsel asserted that the original checks were given to the FBI agent who investigated the embezzlement and never returned, neither Clementi nor Arthur Kaufman, a paralegal assisting plaintiffs' trial counsel, the only witnesses to testify on the subject, had any recollection of or documents to show which checks were turned over. Although the FBI agent testified, plaintiffs' counsel successfully prevented Post's counsel from examining him on this subject.

While plaintiffs claimed that all of the checks in question were cashed by a New Jersey check-cashing service, review of the copies of the checks received in bulk shows, as reflected by the endorsements, that approximately $580,000 of the amount allegedly embezzled was, in fact, deposited into the bank accounts of the payee companies. Nor was there evidence offered to establish that the companies never received any services for the payments of a persuasive nature. The sole testimony on the subject came from Kaufman, who denied knowing anything or having done any work with respect to the 1983 and 1984 checks, totalling over $911,000. As to the balance of the checks, Kaufman, without indicating any contemporaneous knowledge of the business or whether the services were rendered, testified, over objection, that "[t]o the best of my knowledge of looking at the books and records of the company, the company did not receive service for these checks." The books and records were never offered in evidence.

Instead of offering direct evidence that the services allegedly being paid for were never rendered, plaintiffs elicited, over objection, testimony from an attorney for the companies as to lawsuits he had brought or planned in their behalf against several of the payee companies; in some cases, he was permitted to testify as to the settlement of the suits he brought, thereby permitting the jury to draw the inference that, by settling, the payees had admitted that the services were never rendered.

Finally, neither plaintiffs' expert accountant witness nor the managing partner of Post's successor, an independent auditing firm, who testified for plaintiffs, offered any testimony on this critical subject. In contrast, the companies' audited financial statement for the year ending March 31, 1989, certified by the successor auditors, determined the companies' loss due to Hecker's defalcation to be $1,743,900.

As can be seen, each of plaintiffs' witnesses testified that they lacked sufficient familiarity with the check payees and the identities of the freight brokers and forwarders who actually provided services to the companies to establish which payments were legitimate and which were not. The books and records which allegedly supported Kaufman's conclusion that no services had been rendered to support the 1985, 1986 and 1987 checks were never produced. Post was precluded from cross-examining the FBI agent as to the absence of the original checks, allegedly turned over to him.

Nor was there any explanation offered, despite the impression given by plaintiffs' witnesses that all the checks in issue were cashed at the Jersey City check-cashing concern, as to the approximately $580,000 in checks deposited into bank accounts of existing freight forwarding companies. Finally, the companies' audited financial statement for the years ending March 31, 1989 and March 31, 1990, certified by its new accountants, showed the loss due to Hecker's embezzlement to be $1,743,900, the same amount admitted to by Hecker in his plea allocution. Thus, the matter should be remanded for a new trial as well on the companies' claims, which, because of several erroneous evidentiary rulings that may have affected the jury's finding of liability against Post, should not be limited merely to the question of damages.

As already noted, Leonard Bitterman's alleged knowledge of and complicity in the check-cashing scheme was a key defense. At the trial, however, Post was denied the opportunity to establish the role played by Bitterman in the scheme. Post claimed to have confronted Bitterman in 1984 with checks for which there were no supporting invoices and, in light of the explanation that the checks were used to pay for underbilling for imports, for payments to buyers and for Bitterman's own needs, insisted that the transactions be reclassified on the companies' books as "loan receivable-shareholder", to which Bitterman agreed, and that Bitterman repay the loans. Bitterman denied this. During cross-examination, after Bitterman had been questioned about several of the checks he had signed,

the court foreclosed further inquiry on the ground that his lack of recollection concerning specific checks would be the same for all of the checks, ruling that the subject was an appropriate matter for summation but not for further cross-examination. In 1983 alone, before the matter was brought to his attention, Bitterman had signed 24 checks in the total amount of $216,300. Clearly, Bitterman should not have been shielded from further cross-examination on this subject, especially in light of the substantial number and dollar amounts of the checks bearing his signature. The inquiry was relevant not only to the defense but to the issue of comparative fault. In the circumstances, the court's restriction of Post's right to cross-examine Bitterman cannot be viewed as harmless (*see, Peters v Gersch*, 26 NY2d 976, 978).

It was also error to exclude the charts prepared by Post containing summaries of the accountants' voluminous workpapers already in evidence. The workpapers reflected the accountants' contemporaneous activity during the course of their engagement with the companies and were part of the paper trail allegedly linking Leonard Bitterman to the check-cashing scheme. The summary charts would have explained the workpapers and enabled the jurors to understand the procedures carried out by the accountants regarding the discovery and reclassification of the undocumented check payments. Without the summary charts, the workpapers had little meaning to the jury and the court's failure to admit them was error. (*See, Guth Realty v Gingold*, 34 NY2d 440, 452.)

■ Finally, we believe that, based on the conduct of plaintiffs' counsel, a new trial is also in order with respect to the companies' claims against Klein. Early in the trial, plaintiffs called Klein as a witness. During direct examination the following transpired:

"Q. Mr. Klein, isn't it a fact that Herbert Post has paid all your legal fees in this case?

"A. Herbert Post has paid all my legal fees? Not to my knowledge, no.

"Q. His insurance company". Counsel for both Post and Klein objected and moved for a mistrial, which was denied.

As the colloquy between the court and counsel makes clear, the question was not inadvertent but rather deliberately put to counter the fact that, according to plaintiffs' attorney, Post's counsel was "continuously making objections on behalf of Mr. Klein." The obvious effect of the question was to convey to the

jury the fact that there was insurance available and that Klein's defense was being provided by the insurer. These questions were extremely prejudicial (*see*, *Simpson v Foundation Co.*, 201 NY 479) and, taken together with the remarks of plaintiffs' counsel during summation, warrant reversal.

In a blatant and flagrant appeal to prejudice, plaintiffs' counsel reminded the jury that the banks accept "from people like you and me" deposits, which the Federal Government insures. After asking, "who pays for that insurance", counsel answered that "we're the ones who have to pay the price when certified public accountants are dishonest." This, of course, had absolutely nothing to do with the case. Commenting on Klein's attorney, counsel stated, "That was one of the many, many lies that [Klein's counsel] just told you." Counsel also argued, "[Klein is] an expert in how to steal money from your clients when you're a fiduciary. He can afford [Klein's counsel]." Klein was repeatedly called "a thief" and also a "crook", who took bribes from Hecker. These comments were part of a sustained attack on Klein and his attorney and, although they did not elicit an objection, the prejudice is apparent. In such circumstances, Klein is entitled to a new trial.

At the retrial, Post is entitled to a setoff of $178,000, the sum recovered from other parties on account of the alleged embezzlement, against any recovery against it by the companies.

We have examined the other issues raised by this appeal and cross appeal and find that they are without merit.

Accordingly, the judgments of the Supreme Court, New York County (Alice Schlesinger, J.), entered April 12, 1995 and April 14, 1995 in favor of plaintiffs, should be reversed, on the law and on the facts, and in part, as indicated in the exercise of discretion, without costs or disbursements, and the matter remanded for a new trial.

ELLERIN, WALLACH and RUBIN, JJ., concur.

Judgments, Supreme Court, New York County, entered April 12, 1995 and April 14, 1995, reversed, on the law and on the facts, and in part, as indicated in the exercise of discretion, without costs or disbursements, and the matter remanded for a new trial.