Teresa M. DOONER, Plaintiff,

v.

KEEFE, BRUYETTE & WOODS, INC.,
James J. McDermott, Jr. and David
Berry, Defendants.

Civ. No. 00CIV572(JGK).

United States District Court,
S.D. New York.

Aug. 17, 2001.

**OPINION AND ORDER**

KOELTL, District Judge.

In this diversity action, which the parties agree is governed by New York law, the plaintiff, Teresa M. Dooner ("Dooner"), alleges that defendants Keefe, Bruyette & Woods, Inc. ("KBW"), KBW's former Chief Executive Officer, James J. McDermott, Jr. ("McDermott"), and her supervisor at KBW, David Berry ("Berry") committed fraud by representing that the planned initial public offering ("IPO") of KBW was a "sure thing" that would make her a "wealthy woman" despite knowing that McDermott was the subject of a federal investigation arising out of his disclosure of confidential inside information to an adult film star. Relying on the alleged *representations to her, the plaintiff sub-* mitted her resignation to KBW. The KBW IPO was canceled after McDermott revealed that he was under investigation and the plaintiff was not permitted to rescind her resignation.

The plaintiff also brings sex and age discrimination claims pursuant to the New York City Human Rights Law, New York City Administrative Code § 8–107 ("NYCHRL") and the New York State Human Rights Law, N.Y. Executive Law § 296 ("NYHRL") based on alleged harassment, disparate treatment, and retaliation by Berry. The plaintiff also brings various state law claims alleging breach of fiduciary duty, negligence, and breach of contract. The defendants have moved to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). For the reasons stated below, the motion is granted in part and denied in part.

I.

A.

On a motion to dismiss, the allegations in the complaint are accepted as true. *See Grandon v. Merrill Lynch & Co.,* 147 F.3d 184, 188 (2d Cir.1998). In deciding a motion to dismiss, all reasonable inferences must be drawn in the plaintiff's favor. *See Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995); *Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir.1989). The court's function on a motion to dismiss is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden,* 754 F.2d 1059, 1067 (2d Cir.1985). Therefore, the defendants' present motion should only be granted if it appears that the plaintiff can prove no set of facts in support of her claim that would entitle her to relief. *See Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Grandon,* 147 F.3d at 188; *see also Goldman,* 754 F.2d at 1065.

In deciding the motion, the court may consider documents referenced in the complaint and documents that are in the plaintiff's possession or that the plaintiff knew of and relied on in bringing suit. *See*

*Brass v. American Film Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir.1993); *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47–48 (2d Cir.1991); *I. Meyer Pincus & Assoc., P.C. v. Oppenheimer & Co., Inc.*, 936 F.2d 759, 762 (2d Cir.1991); *Skeete v. IVF America, Inc.*, 972 F.Supp. 206, 208 (S.D.N.Y.1997).

### B.

The Court accepts the following allegations as true for purposes of this motion. The plaintiff began working for KBW as an executive secretary in 1963 and had risen to the level of vice-president in the research department by the time she left KBW in 1999. (Am.Compl.¶¶ 9–10.) During her time at KBW, the plaintiff received positive performance reviews as well as numerous stock awards. (Am.Compl.¶ 11.)

While initially her working environment was pleasant, beginning in 1996 the situation changed when Berry became the plaintiff's direct supervisor. (Am. Compl.¶¶ 12–13.) From the start, Berry consistently abused, harassed, and insulted her solely on the basis of her gender. (Am.Compl.¶ 13.)

On May 13, 1996, the plaintiff filed a memorandum detailing Berry's abusive behavior, which included using sexually explicit terms in addressing the plaintiff, assigning the plaintiff duties normally reserved for lower level employees, treating the plaintiff like a secretary, and using pejorative derivations of the plaintiff's first name in addressing her. (Am.Compl.¶ 15.) The behavior was pervasive and interfered with the plaintiff's ability to perform her duties. (Am.Compl.¶ 16.) Berry did not direct such harassment at any male employees. (Am.Compl.¶ 17.) Before submitting the memorandum, the plaintiff spoke to the Chairman of KBW, Charles Lott ("Lott"). (Am.Compl.¶ 18.) Lott set up a meeting with the plaintiff and Berry and demanded that Berry explain his actions. (Am.Compl.¶ 19.) The plaintiff tried to resolve the issue amicably by accepting Berry's apology. (Am. Compl.¶ 20.)

However, Berry's harassment did not stop and by the middle of 1997 his behavior re-intensified to the point where the plaintiff wanted to resign. (Am. Compl.¶ 21.) Berry treated similarly situated male employees more favorably than he treated the plaintiff. (Am.Compl.¶ 22.) Berry refused to complete reviews of the plaintiff's performance, gave her demeaning tasks, and generally reduced her authority within the department. (Am. Compl.¶ 22.)

The plaintiff alleges that the only reason she stayed at KBW was because McDermott, who was then the Chief Executive Officer of KBW, assured her that the situation would improve and that it would be worth her while to stay. (Am.Compl.¶¶ 7, 23.) In 1998, Dooner first learned that KBW was planning an IPO for later that year. (Am.Compl.¶ 24.) Throughout 1998, Berry's behavior continued although it became more invidious in response to rebukes for his conduct by senior management as a result of the plaintiff's complaints. (Am.Compl.¶¶ 25–26.) Berry refused to recognize the plaintiff's position in the company, undermined her authority, denied her feedback, held her to different standards of review than her male counterparts, and verbally chastised her in front of her peers. (Am.Compl.¶¶ 25, 37–39.) Berry did not complete an annual review for the plaintiff, which made her ineligible for promotion or salary increases from 1998 to the end of her tenure, and did not recommend her for a bonus. (Am. Compl.¶¶ 27–28, 30, 32.) In contrast, Berry made bonus recommendations, completed reviews, and supervised the male em-

ployees who reported to him. (Am. Compl.¶¶ 32–34.)

The Board was aware of Berry's behavior and read the plaintiff's 1996 memorandum detailing Berry's conduct. (Am. Compl.¶ 29.) On a number of occasions in 1998, the plaintiff complained about Berry's harassment to McDermott and contemplated resigning. (Am.Compl.¶¶ 35–36.)

By early 1999, the plaintiff was on the verge of leaving KBW but McDermott again persuaded her that it would be "worth her while" to stay. (Am. Compl.¶ 42.) McDermott also promised her that the problems with Berry would be resolved after the IPO because Berry would be replaced. (Am.Compl.¶ 43.) McDermott said that the Board was interviewing people to replace Berry but that a high-level termination could only occur after the IPO. (Am. Compl. ¶¶ 43–44.)

Early in 1999, KBW reinstated plans for a stock IPO scheduled for May 13, 1999. (Am.Compl.¶¶ 45, 63.) KBW had scuttled a prior IPO attempt in October 1998, but the 1999 IPO was presented as a "sure thing" to the plaintiff and stock holders of KBW. (Am.Compl.¶ 46.) The plaintiff alleges that McDermott specified the precise nature of her potential gain. (Am. Compl.¶ 47.) McDermott told her that her 13,380 shares would become 224,861 shares after the IPO and that the shares would be worth between 17 and 19 dollars. (Am. Compl.¶¶ 48–50.) While the Board and McDermott originally stated that the offering would be priced at between three and four times book value, the prospectus, which came out in early 1999, indicated that the offering would be priced at one and one-half times book value. (Am. Compl.¶¶ 51–52.) The plaintiff alleges that the pricing was lowered so that the IPO would move quickly. (Am.Compl.¶ 54.)

Based on the representations and discussions with McDermott where he informed her that the IPO "was a done deal", the plaintiff decided to retire from KBW after the completion of the IPO. (Am.Compl.¶ 55.) The plaintiff alleges that McDermott knew that the IPO would not occur when he made these representations to the plaintiff. (Am.Compl.¶ 56.) The plaintiff bases this claim on McDermott's knowledge of his relationship with Kathryn Gannon a/k/a Marilyn Star ("Gannon"), an adult film star with whom he allegedly shared inside information. (Am. Compl.¶ 57.) McDermott also did not reveal that he was under investigation by the Securities and Exchange Commission ("SEC") and the United States Attorney's Office. (Am.Compl.¶ 57.) The plaintiff also claims that several of the Board members of KBW knew of McDermott's relationship with Gannon but did nothing. (Am.Compl.¶ 58.)

The plaintiff decided she would resign after the IPO to avoid the continued harassment by Berry. (Am.Compl.¶ 59.) She also decided to contribute her shares in order to help the company by adding her stock to the IPO amount and to obtain funds to buy a retirement home in Florida. (Am.Compl.¶ 59.) The plaintiff alleges that McDermott was motivated to commit fraud because he did not want the plaintiff to leave KBW and file a lawsuit against KBW and Berry and also wanted her to relinquish her shares. (Am.Compl.¶ 59.) The plaintiff alleges that the KBW board knew about her reliance on the IPO and her reliance on the representations concerning the IPO made by McDermott and Lott. (Am.Compl.¶ 60.)

On April 28, 1999, Dooner confirmed her intention to resign and tender her shares for the IPO in writing and designated May 27, 1999 as her final day. (Am. Compl.¶ 64.) Before she submitted her

letter, McDermott again reassured her that "you [Dooner] are going to make a lot of money out of it [the IPO]." (Am. Compl.¶ 68.) Later that week, Lott called the plaintiff into his office and informed her that "[w]hen you retire you will be a wealthy woman." (Am.Compl.¶ 67.) McDermott also told the plaintiff during the first week of the IPO's road show in Europe that the IPO could have been completed in Europe. (Am.Compl.¶ 72.)

The plaintiff alleges that some of the Board members knew or should have known that the IPO would not proceed based on the pending SEC investigation into McDermott's improper actions. (Am. Compl.¶ 69.) Berry was allegedly aware of McDermott's relationship with Gannon and the plaintiff alleges, on information and belief, that Berry was also aware of the SEC investigation. (Am.Compl.¶ 70.)

On or about May 9, 1999, McDermott called a board meeting at which he revealed his connection with Gannon and that there might be an investigation about this relationship centering around allegations of insider trading. (Am.Compl.¶ 74.) The Board voted unanimously to cancel the IPO and KBW's shareholders were informed on May 10, 1999. (Am. Compl.¶¶ 75–76). The Board offered no explanation for the cancellation. (Am. Compl.¶ 77.) The plaintiff alleges that senior Board members made false assurances of a future IPO or sale with the intent of increasing shareholder and employee investment in KBW and avoiding a shareholder derivative action. (Am. Compl.¶ 78.)

On May 11, 1999, the plaintiff spoke to McDermott about the canceled IPO and McDermott told the plaintiff that he would push for a sale although he knew that the Board could not afford to let him remain as Chief Executive Officer. (Am. Compl.¶ 80.) McDermott also promised

the plaintiff he would give her a raise by paying off a tranche payment in order to induce her to stay at KBW and told her that he did not want her to leave. (Am. Compl.¶ 81.)

Later that day, Berry called the plaintiff into his office and gave her three options for dealing with the cancellation of the IPO. (Am.Compl.¶ 82.) The plaintiff could (1) retire, sell her stock to the company for book value, and enter into an agreement where she would get additional renumeration if the IPO was done by the end of the year; (2) retire, and leave her stock in the company until the end of year; or (3) not retire. (Am.Compl.¶ 83.) On May 12, 1999, the plaintiff wrote to McDermott asking that her prior retirement be rescinded because it was based solely on the alleged misrepresentations that the IPO was a "sure thing." (Am.Compl.¶ 85.)

At some point, the Board locked out McDermott from the management of KBW in response to concerns over the possible governmental investigation into McDermott's relationship with Gannon, which the plaintiff alleges was a "short-sighted" effort to save face. (Am.Compl.¶¶ 86–87.) Over the next few weeks, the plaintiff was told by several Board members including Lott, Berry, and Stan Wells ("Wells") that the Board was considering her position and a positive resolution was forthcoming. (Am.Compl.¶ 88.) On or about May 17, 1999, the Board held a meeting, made Berry a member of the Board and promoted 56 employees. (Am.Compl.¶ 90.) Berry announced at the meeting that the plaintiff would be "resigning like Jim McDermott." (Am.Compl.¶ 91.) The plaintiff alleges that Berry's earlier offer to allow her to remain with the company was not made in good faith. (Am. Compl.¶ 94.)

After the announcement by Berry, the plaintiff continued to work on her assign-

ments at KBW. (Am.Compl.¶ 95.) In the latter part of May and June 1999, various Board members, including McDermott and Wells, stated their belief that KBW would be sold at a considerable profit. (Am. Compl.¶ 99.) Lott, Wells, and Berry knew that the sale would not be successful given the true reason for McDermott's lockout. (Am.Compl.¶ 100.) The plaintiff was effectively ignored by Berry and referred no new assignments, new opportunities, or promotions. (Am.Compl.¶ 101.) In June 1999, the plaintiff decided to leave KBW with a resignation date effective July 31, 1999 and had to give up her KBW shares. (Am.Compl.¶¶ 101–02.)

On or about July 20, 1999, Berry informed the plaintiff that her shares would be repurchased by KBW at their book value as of July 31, 1999. (Am. Compl.¶ 103.) The plaintiff alleges that she lost between a dollar and a dollar and fifty cents per share because this assessment date was different from an originally agreed to assessment date. (Am. Compl.¶ 104.) The agreement also provided that if KBW had an IPO before March 21, 2000, Dooner would receive additional renumeration. (Am.Compl.¶ 105.) The defendants knew that there would be no IPO and continued to induce the plaintiff's hope while withholding information. (Am. Compl.¶ 106.) At a July 1, 1999 shareholder meeting, the Board refused to answer questions about the IPO or the lockout of McDermott. (Am.Compl.¶ 111.)

Berry hired a replacement for the plaintiff, allegedly prior to the plaintiff's notification to KBW of her renewed intention to retire. (Am.Compl.¶¶ 112–13.) Berry was rude and verbally abusive to the plaintiff in a dispute about when the plaintiff was to come in to train her replacement. (Am. Compl.¶¶ 118, 121–22.) The plaintiff became greatly agitated because of this conflict, causing her physical injury. (Am.

Compl.¶ 120.) Berry allegedly threatened to withdraw any offer the Board had made to the plaintiff if she did not come in on a date that was different from a date that had been agreed to earlier. (Am. Compl.¶ 127.) Berry also denied the plaintiff an investment guide. (Am. Compl.¶ 130.) While other retiring individuals received profit sharing money within one month, the plaintiff's money arrived 10 weeks after the end of the fiscal quarter. (Am.Compl.¶¶ 133–38.)

The plaintiff brings a total of eleven causes of action against the defendants. The first three causes of action allege fraud. (1) The first cause of action is for fraud against KBW and McDermott. It alleges that McDermott and KBW Board members committed fraud by representing that the IPO was a "sure thing" and would make the plaintiff rich despite knowing that the IPO would not occur because of an investigation targeted at McDermott. The plaintiff alleges that she was induced by these representations to resign her job, to tender her shares to the IPO, to purchase a home in Florida based on the expected revenue, and to forego a discrimination suit against KBW. (2) The second cause of action is for fraud against KBW and Berry. It alleges that Berry offered the plaintiff options for dealing with the IPO but had no intention of honoring those options. The plaintiff alleges that Berry did this to induce the plaintiff to refrain from taking action against the Board for her lost opportunities. (3) The third cause of action alleges fraud against all of the defendants. It alleges that the defendants told the plaintiff that the canceled IPO was not a problem because a lucrative sale of KBW was planned. The plaintiff claims that the defendants knew that these statements were false but made them so she would not bring a derivative action against KBW.

The fourth through seventh causes of action allege that Berry and KBW discriminated against the plaintiff. (4) The fourth cause of action is a hostile work environment claim against KBW and Berry based on the New York State and New York City Human Rights Laws. (5) The fifth cause of action alleges disparate treatment in violation of the New York State and New York City Human Rights Laws against KBW and Berry. It alleges that the plaintiff was denied a promotion and salary increases, was not permitted to rescind her resignation, and was generally treated differently because she was an older woman.(6) The sixth cause of action alleges wrongful termination against KBW and Berry in violation of the New York State and New York City Human Rights laws. The plaintiff alleges that she was driven from her job and not allowed to rescind her resignation because of her gender and age. (7) The seventh cause of action alleges discriminatory retaliation against KBW and Berry in violation of the New York State and New York City Human Rights laws. The plaintiff alleges that Berry intensified his harassment of Berry after she filed a complaint in 1996 reporting his harassment.

The eighth through eleventh causes of action are various actions based on state law. (8) The eighth cause of action alleges misrepresentation against KBW and Berry. The plaintiff claims that she believed that a different assessment formula would be applied to the sale of her shares when she left the company. (9) The ninth cause of action is for breach of fiduciary duty against the defendants. The plaintiff alleges that the defendants violated their duty of care to her as a shareholder of KBW. (10) The tenth cause of action is for negligence against KBW and McDermott. It alleges that McDermott did not act as a reasonable CEO in having an affair with Gannon and that his actions prevented the

IPO. (11) The eleventh cause of action is for breach of contract against KBW. It alleges that KBW breached an agreement to provide severance payments to the plaintiff.

## II.

The defendants move pursuant to Fed. R.Civ.P. 12(b)(6) to dismiss the plaintiff's first, second, third, and eighth claims for fraud and misrepresentation. They argue that the claims are based on predictions about the future or are promises of future action that cannot sustain a fraud action under New York law.

■ Under New York law, a claim for fraud based on false statements must allege the following elements: (1) a material false representation of an existing fact; (2) made with knowledge of its falsity; (3) with an intent to defraud; (4) reasonable reliance; (5) and damages. *See, e.g., Cohen v. Koenig*, 25 F.3d 1168, 1172 (2d Cir.1994); *Four Finger Art Factory, Inc. v. Dinicola*, No. 99 Civ. 1259, 2001 WL 21248, at *3 (S.D.N.Y. Jan. 9, 2001); *Channel Master Corp. v. Aluminum Ltd. Sales, Inc.*, 4 N.Y.2d 403, 176 N.Y.S.2d 259, 151 N.E.2d 833, 835 (1958).

## A.

■ The defendants' motion to dismiss the plaintiff's first cause of action for fraud must be granted. The gist of this claim is that McDermott and KBW committed fraud by representing that the IPO was a "sure thing" despite knowing that the IPO would not occur.

■ The first cause of action fails to allege the first element of a fraud claim because it does not allege a material false representation of an existing fact. The amended complaint only describes characterizations by the defendants about the

future prospects of the IPO. For example, the first cause of action alleges that McDermott and KBW board members assured the plaintiff that her situation would improve (Am.Compl.¶ 23), that it would be "worth her while to stay" (Am.Compl.¶ 42), that the IPO was a "sure thing" (Am. Compl.¶ 46), that the IPO was a "done deal" (Am.Compl.¶ 55), that the plaintiff would "make a lot of money" (Am. Compl.¶ 68), and that the plaintiff would retire a "wealthy woman." (Am. Compl.¶ 66.) Statements of "prophecy and prediction of something which it is merely hoped or expected will occur in the future" are not actionable. *Channel Master Corp.*, 176 N.Y.S.2d 259, 151 N.E.2d at 836; *accord Cohen*, 25 F.3d at 1172; *Quasha v. American Natural Beverage Corp.*, 171 A.D.2d 537, 567 N.Y.S.2d 257, 257 (1991); *Romano v. Key Bank of Central New York*, 90 A.D.2d 679, 455 N.Y.S.2d 879, 881–82 (1982). A representation with respect to an "unreckonable future phenomenon ... in circumstances that could neither be foreseen with certainty nor controlled with precision" is too "heavily freighted with prophecy, speculation and chance" to support a cause of action for fraud. *Burgundy Basin Inn, Ltd. v. Watkins Glen Grand Prix Corp.*, 51 A.D.2d 140, 379 N.Y.S.2d 873, 879 (1976).

The first cause of action is based entirely on representations with respect to uncertain future events and cannot support an action for fraud. The fulfillment of plans for any IPO is never a certainty. In fact a prior IPO attempt by KBW had failed. (Am.Compl.¶ 46.) Market conditions and events affecting the market's perception of a company involve circumstances that no individual can control or predict with certainty. By stating that the IPO was a "sure thing," the defendants only expressed their optimism about an event out of their control. They did not commit fraud through such statements.

The statements that the plaintiff bases her claim on are classic examples of speculative expression. There are no allegations with respect to present facts such as information in KBW's financial statements that would support a fraud claim. *See, e.g., Cohen*, 25 F.3d at 1172. The amended complaint emphasizes that McDermott specified the precise nature of her potential gain (Am.Compl.¶¶ 47–50), but the precision in any such statement does not alter the fact that such a statement was directed at "potential" gain and was a prediction of future events.

The amended complaint does not allege a material false representation of an existing fact. Therefore, the first cause of action must be dismissed.

██ Furthermore, the first cause of action does not sufficiently allege facts establishing the third element of a fraud claim, intent to defraud. Under Fed. R.Civ.P. 9(b), a plaintiff can allege fraudulent intent generally, but a plaintiff must allege facts that give rise to a strong inference of fraudulent intent. *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir.1994). This strong inference can be established either "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Id.; Four Finger Art Factory, Inc.*, 2001 WL 21248 at *5.

In this case, the plaintiff has failed to allege either basis for showing an intent to defraud. The gist of the alleged fraud is that the defendants knowingly deceived the plaintiff about the potential success of the IPO. The plaintiff attempts to manufacture a motive by arguing that the defendants promoted the potential success of the IPO to dissuade the plaintiff from bringing a discrimination lawsuit. But the

essence of the alleged fraud is that the defendants knew that their optimistic predictions about the IPO were false and thus the IPO would come crashing down. At that point, the plaintiff would still be left with whatever claims of discrimination she had. Therefore, the alleged motive makes no sense.

There are also no facts to indicate that the defendants were knowingly promoting an IPO that they knew would fail. The plaintiff has failed to allege why the defendants would have engaged in such a self-defeating course of conduct.

Finally, the plaintiff asserts in paragraph 59 of the amended complaint that McDermott represented the IPO as a "sure thing" because he wanted the plaintiff to tender her shares into the IPO. However, there are simply no facts alleged in the amended complaint to support an inference that McDermott had such a motive. There is no allegation explaining why McDermott would want the plaintiff to tender her shares. There is no allegation that the plaintiff owned a number of shares so substantial that the defendants would have cared whether or not she tendered her shares. The plaintiff's allegation that McDermott wanted her to tender her KBW shares is too conclusory to support an inference of fraudulent intent.

The amended complaint does not allege sufficient facts to infer that the defendants acted with fraudulent intent.

■ The plaintiff has also failed to allege reasonable reliance. No reasonable investor could rely on the types of optimistic predictions of the success of an inherently future prediction such as the IPO is a "sure thing." *See, e.g., Stuart Silver Assoc., Inc. v. Baco Dev. Corp.,* 245 A.D.2d 96, 665 N.Y.S.2d 415, 417–18 (1997); *FMC Corp. v. Fleet Bank,* 226 A.D.2d 225, 641 N.Y.S.2d 25, 26 (1996).

### B.

■ The plaintiff's second cause of action also fails to allege a claim for fraud. The plaintiff argues that Berry committed fraud by telling her after the IPO was canceled that she would have a number of options including taking back her retirement. (Am.Compl.¶¶ 82–83.) However, "[m]ere promissory statements as to what will be done in the future are not actionable." *Adams v. Clark,* 239 N.Y. 403, 146 N.E. 642, 644 (1925). "It is well settled under New York law that a fraud claim based on a promise of future action ... must allege that at the time the promise was made the promisor did not intend to honor the promise." *I.M. Oberman Assoc., Inc. v. Republic Fin. Serv., Inc.,* No. 92 Civ. 1843, 1993 WL 88209, at *3 (S.D.N.Y. March 25, 1993); *accord Feigenbaum v. Marble of America, Inc.,* 735 F.Supp. 79, 83 (S.D.N.Y.1990); *First Nat'l Bank of Hamden v. Kaufman,* 58 A.D.2d 668, 395 N.Y.S.2d 713, 714 (1977). For there to be a fraud claim, there must be more than a conclusory allegation that the defendant had no intention to perform a promise of future action. *See, e.g., Songbird Jet Ltd., Inc. v. Amax Inc.,* 581 F.Supp. 912, 925 (S.D.N.Y.1984) (Weinfeld, J.).

Berry's representation that the plaintiff would have three options for dealing with the canceled IPO was a promise of future action. The statement implied that the plaintiff could choose one of the options and that KBW would act to adjust the plaintiff's status in accordance with that choice. While the plaintiff asserts that Berry knew that she would not have these options and did not make the representation in good faith, the amended complaint describes no more than a conclusory allegation that Berry knew that he would not follow through on the options. Indeed the

Amended Complaint alleges that the plaintiff was told by several Board members that the Board was considering her position and a positive resolution would be forthcoming. (Am.Compl.¶ 88.)

■ Moreover, the second cause of action fails to allege fraudulent intent with particularity. The plaintiff was allegedly told about her various alternatives on May 11, 1999. However, at a Board meeting on May 17, 1999, it was announced that the plaintiff would be resigning. The Amended Complaint implies that the motive for the alleged misrepresentation was to dissuade the plaintiff from bringing a derivative suit against the KBW. (Am. Compl.¶ 160.) But this makes no sense when the alleged misrepresentation was made on May 11 and it was clear that the plaintiff was resigning as a result of the announcement on May 17 at which time the plaintiff was free to take any actions she thought appropriate.

■ Finally, the plaintiff fails to allege any reliance. While the plaintiff alleges she continued to perform her job, the plaintiff could only have been under a misapprehension as to whether she was resigning for about six days during which time she would have been working in any event.

### C.

■ The plaintiff's third cause of action also does not state a cause of action for fraud. The third cause of action alleges that the Board made assurances there would be a future IPO or sale (Am. Compl.¶ 78), and that McDermott represented that he would push for a sale. (Am.Compl.¶ 80.) The third cause of action is essentially based on a representation of prophecy or prediction and a promise of future action. Therefore, it does not state a claim for fraud for the same rea-

sons that the first and second causes of action do not.

■ The third cause of action also does not sufficiently allege an intent to defraud the plaintiff. While the third cause of action alleges that the defendants wanted to keep the plaintiff from filing a derivative lawsuit, there is no allegation that the plaintiff was threatening to file such a suit and that the defendants knew about it. The plaintiff's third cause of action must be dismissed.

### D.

■ The plaintiff's eighth cause of action for misrepresentation must also be dismissed. It is well established that to satisfy Fed.R.Civ.P. 9(b), a claim for fraud must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir.1993). The eighth cause of action does not state what fraudulent statement was made, with an intent to defraud, nor does it indicate any reliance. The eighth cause of action does allege that when "Berry told Dooner that she would get the value of her shares as of July 31, 1999, it was understood that the calculation would be made under the assessment procedure in place at the time of the agreement...." (Am.Compl.¶ 233.) By relying on an "understanding," the plaintiff has failed to allege what was falsely stated with an intent to defraud. Moreover, it is clear that there was no reliance on what was allegedly said. Elsewhere in the Amended Complaint the plaintiff alleges that Berry "mandated" an evaluation of the plaintiff's shares as of July 31, 1999, and that she had "no option" but to accept the evaluation. (Am.Compl.¶¶ 103, 104.) Plainly, this is not a claim for fraud but

rather a claim that KBW evaluated the plaintiff's stock in accordance with a formula with which she disagreed.

### D.

The plaintiff's first, second, third, and eighth causes of action must be dismissed. However, because it cannot be said that the plaintiff cannot plead any claim for fraud, these causes of action are dismissed without prejudice to repleading.

### III.

■ The defendants move to dismiss the plaintiff's fourth, fifth, sixth, and seventh causes of action, which allege that KBW and Berry discriminated against her in violation of the New York City and New York State Human Rights Laws. Claims brought under the New York City and New York State Human Rights Laws are evaluated under the same framework used to assess Title VII claims. *See Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 565 n. 1 (2d Cir.2000).

### A.

■ The plaintiff's fourth cause of action states a hostile work environment claim. To state a claim of hostile work environment harassment, the plaintiff must allege that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment." *Cruz*, 202 F.3d at 570 (internal quotations and citations omitted); *see also Tanay v. St. Barnabas Hospital*, No. 99 Civ. 9215, 2001 WL 262695, at *7 (S.D.N.Y. March 15, 2001). "[T]he plaintiff must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment." *Cruz*, 202 F.3d at 570 (in-

ternal quotations and citations omitted); *accord Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 69 (2d Cir.2000). The plaintiff must show that based on the totality of circumstances the conduct has created an "objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive...." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). The circumstances "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.*

■ The plaintiff must also provide a basis for imposing liability on the employer for the conduct creating the hostile environment. *See Howley v. Town of Stratford*, 217 F.3d 141, 154 (2d Cir.2000) (citations omitted); *see also Jones v. New York City Dep't of Correction*, 99 Civ. 10031, 2001 WL 262844, at *6 (S.D.N.Y. March 15, 2001). There is a presumption that an employer is vicariously liable for a hostile work environment created by a supervisor of a victimized employee. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); *see also Cruz*, 202 F.3d at 572 n. 8. Where there has been no tangible employment action taken, an employer may establish an affirmative defense to liability by proving: "(a) that the employer exercised reasonable care to prevent and correct promptly any ... harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Id.*

■ The defendants' motion to dismiss the plaintiff's hostile work environ-

ment claim is without merit. The amended complaint clearly alleges sufficiently severe and persistent incidents directed at the plaintiff allegedly because of her age and sex (Am.Compl.¶¶ 13–25, 37–39) to support a hostile work environment claim. *See, e.g., Woodford v. Community Action Agency of Greene County, Inc.,* 239 F.3d 517, 526 (2d Cir.2001). The defendants allege that there is no cause of action because management addressed the plaintiff's complaints, but the plaintiff alleges that management ignored her complaints, which raises an issue of fact that cannot be decided on a motion to dismiss.

### B.

The plaintiff's fifth and sixth causes of action sufficiently allege disparate treatment claims based on her sex and age. The plaintiff's disparate treatment claims are governed by the standard established by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under the *McDonnell Douglas* analysis, the plaintiff has the burden of proving a prima facie case of discrimination. *See Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *see also Tanay,* 2001 WL 262695, at *4. To establish a prima facie case of employment discrimination, a plaintiff must show (1) membership in a protected class; (2) satisfactory job performance; (3) termination from employment or other adverse employment action; and (4) that this adverse employment decision occurred under circumstances giving rise to an inference of discrimination. *See Tarshis v. Riese Org.,* 211 F.3d 30, 35 (2d Cir.2000) (citing *McDonnell Douglas Corp.,* 411 U.S. at 802, 93 S.Ct. 1817); *Quaratino v. Tiffany & Co.,* 71 F.3d 58, 64 (2d Cir.1995). The burden of proof in establishing a prima facie case is de minimis. *See Zimmer-*

*mann v. Associates First Capital Corp.,* 251 F.3d 376, 381 (2d Cir.2001). The fourth element of the prima facie case may be satisfied by a showing that the plaintiff's position remained open after she was discharged, or that she was replaced by someone outside her protected class. *See Tarshis,* 211 F.3d at 36 (*citing McDonnell Douglas Corp.,* 411 U.S. at 802, 93 S.Ct. 1817).

When a plaintiff has successfully demonstrated the elements of a prima facie case, the burden of production shifts to the defendant to "articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (*quoting McDonnell Douglas Corp.,* 411 U.S. at 802, 93 S.Ct. 1817). After the defendant articulates a legitimate reason for the action, the presumption of discrimination raised by the prima facie case drops out, and the plaintiff has the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision and that sex or age was. *See id.* at 255–56 & n. 10, 101 S.Ct. 1089; *Fisher v. Vassar College,* 114 F.3d 1332, 1336 (2d Cir.1997). "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089; *see also Reeves,* 530 U.S. at 143, 120 S.Ct. 2097; *Fisher,* 114 F.3d at 1336. The Second Circuit Court of Appeals has instructed that in determining whether the plaintiff has met this burden, a court is to use a "case by case" approach that evaluates "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports [or undermines] the employer's case." *James v. New York Racing Assoc.,*

233 F.3d 149, 156 (2d Cir.2000) (*quoting Reeves*, 120 S.Ct. at 2109); *accord Schnabel v. Abramson*, 232 F.3d 83, 90–91 (2d Cir.2000); *Alleyne v. Four Seasons Hotel——New York*, No. 99 Civ. 3432, 2001 WL 135770, at *10 (S.D.N.Y. Feb. 15, 2001). "The task ... is to examine the entire record and ... make the case-specific assessment as to whether a finding of discrimination may reasonably be made." *Zimmermann*, 251 F.3d at 382.

The plaintiff can meet the third requirement of a prima facie case by establishing that she was subject to a materially adverse change to the terms and conditions of her employment. *See, e.g., Galabya v. New York City Board of Educ.*, 202 F.3d 636, 640 (2d Cir.2000); *Medwid v. Baker*, 752 F.Supp. 125, 136–37 (S.D.N.Y.1990). "A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary ... or other indices ... unique to a particular situation." *Galabya*, 202 F.3d at 640 (citations and internal quotations omitted). While the plaintiff was not actually terminated, she may show that she was subject to a materially adverse change by demonstrating that her employer constructively discharged her. A constructive discharge occurs when an employer intentionally creates an "intolerable work atmosphere that forces an employee to quit involuntarily." *Chertkova v. Connecticut Gen. Life Ins. Co.*, 92 F.3d 81, 89 (2d Cir.1996); *accord Stetson v. NYNEX Serv. Co.*, 995 F.2d 355, 360 (2d Cir.1993). "Working conditions are intolerable if they are so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Chertkova*, 92 F.3d at 89 (citation and internal quotations omitted).

The defendants argue that the plaintiff has not stated a claim for dispa-

rate treatment because she retired voluntarily. However, the amended complaint alleges that the plaintiff resigned because her working conditions became intolerable. She alleges that Berry made her working environment intolerable because of her sex and age. If the facts the plaintiff alleges are true, there is at least an issue of fact with respect to whether a reasonable person in the plaintiff's shoes would have felt compelled to resign. The defendants' motion to dismiss the plaintiff's fifth and sixth causes of action is denied.

### C.

The plaintiff's seventh cause of action sufficiently states a claim for retaliation. Both the New York City and the New York State Human Rights Laws make it unlawful for an employer to retaliate against an employee because the employee has opposed a discriminatory practice. *See* N.Y.C. Admin. Code § 8–107(7); N.Y. Exec. Law § 296(1)(e). Claims of retaliation are analyzed according to the burden-shifting framework laid out in *McDonnell Douglas*. *See Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1038–39 (2d Cir.1993). The plaintiff must first establish a prima facie case of retaliation. If the plaintiff succeeds in making out a prima facie case the burden of production shifts to the defendant to articulate a legitimate, nonretaliatory reason for the adverse employment action. If the defendant meets that burden, the plaintiff has the opportunity to demonstrate that the defendant's proffered reason was merely a pretext for retaliation. *See Richardson v. New York State Dep't of Corr. Serv.*, 180 F.3d 426, 443 (2d Cir.1999); *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 768–69 (2d Cir.1998). A violation may be found if the adverse employment action was based in part on a retaliatory purpose, even if that was not the sole

motive. *See Cosgrove,* 9 F.3d at 1039; *Davis v. State Univ. of New York,* 802 F.2d 638, 642 (2d Cir.1986); *Iannone v. Frederic R. Harris, Inc.,* 941 F.Supp. 403, 410 (S.D.N.Y.1996). Once the plaintiff demonstrates that a retaliatory factor played a "motivating part" in the adverse employment decision, the defendant must demonstrate that it would have made the same decision based on the legitimate factor alone. *Cosgrove,* 9 F.3d at 1040.

■■■■ To make out a prima facie case of retaliation, a plaintiff must show: (1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action. *See Gordon v. New York City Board of Educ.,* 232 F.3d 111, 113 (2d Cir.2000); *Richardson,* 180 F.3d at 443; *Quinn,* 159 F.3d at 769. To establish that an activity was protected, a plaintiff need only prove that she was acting under a good faith belief that the activity was of the kind covered by the statute. *Cosgrove,* 9 F.3d at 1039. "Proof of the causal connection can be established indirectly by showing that the protected activity was closely followed in time by the adverse action." *Manoharan v. Columbia Univ. College of Physicians & Surgeons,* 842 F.2d 590, 593 (2d Cir.1988); *see also De-Cintio v. Westchester County Medical Center,* 821 F.2d 111, 115 (2d Cir.1987); *Gordon,* 232 F.3d at 117; *Fowler v. New York Transit Auth.,* No. 96 Civ. 6796, 2001 WL 83228, at *2–3 (S.D.N.Y. Jan. 31, 2001).

■■■ The amended complaint alleges that the plaintiff engaged in protected activity by submitting a complaint in 1996 regarding Berry's alleged harassment. (Am.Compl.¶ 15.) The amended complaint claims that the defendants knew about the complaint. (Am.Compl.¶¶ 18–20, 29.) She also claims that she made subsequent complaints about Berry. (Am.Compl.¶ 26.) The amended complaint alleges that Berry subjected the plaintiff to adverse employment actions after she filed the complaint and after she continued to complain about him. (Am.Compl.¶¶ 21–22, 25–28, 30, 32.) The issue of whether there is a causal connection between the protected activity and the adverse employment actions alleged is a question of fact that cannot be decided on this motion to dismiss.

The defendants' motion to dismiss the plaintiff's seventh cause of action is therefore denied.

## V.

The defendants next move to dismiss the plaintiff's ninth cause of action, which alleges that the defendants breached their fiduciary duty to her.

■■■ Generally, a shareholder has no individual cause of action for an injury to the corporation even though he "loses the value of his investment or incurs personal liability in an effort to maintain the solvency of the corporation." *Abrams v. Donati,* 66 N.Y.2d 951, 498 N.Y.S.2d 782, 489 N.E.2d 751, 751 (1985); *see also PI, Inc. v. Ogle,* No. 95 Civ. 1723, 1997 WL 37941, at *3 (S.D.N.Y. Jan. 30, 1997). Suits for injury to a corporation must be brought derivatively on behalf of the corporation rather than by the individual shareholders. *Id.* There is an exception to this rule when "the wrongdoer has breached a duty owed to the shareholder independent of any duty owing to the corporation wronged." *Abrams,* 498 N.Y.S.2d 782, 489 N.E.2d at 752; *see also Ceribelli v. Elghanayan,* 990 F.2d 62, 63 (2d Cir. 1993); *Herbert H. Post & Co., v. Sidney Bitterman, Inc.,* 219 A.D.2d 214, 639 N.Y.S.2d 329, 336 (App.Div.1996). An individual shareholder can sue for "an injury

which is separate and distinct from that suffered by other shareholders, such as the right to vote, or to assert majority control, which exists independently of the corporation." *Lenz v. Associated Inns and Restaurants Co. of America*, 833 F.Supp. 362, 380 (S.D.N.Y.1993) (internal citations and quotations omitted).

■ The plaintiff is no longer a shareholder of KBW. (Am.Compl.¶ 102.) Therefore, she cannot bring a derivative action on behalf of the corporation. *Silverman v. Schwartz*, 248 A.D.2d 332, 670 N.Y.S.2d 95, 95 (1998); *Rubinstein v. Catacosinos*, 91 A.D.2d 445, 459 N.Y.S.2d 286, 287, *aff'd* 60 N.Y.2d 890, 470 N.Y.S.2d 570, 458 N.E.2d 1247 (1983).

■ Moreover, there is no allegation that the plaintiff suffered an injury distinct from other shareholders or that KBW breached a duty it owed independently to her. The plaintiff argues that she suffered unique losses such as the loss of her career, a lost opportunity to purchase a house, loss of benefits, and loss of the value of her shares. However, these losses all originate from the failure of the IPO allegedly caused by the defendants. The failure of an IPO is a harm to the corporation. All shareholders of KBW were harmed by the failure of the IPO because their shares may have risen in value if the IPO had succeeded. Each of the shareholders of KBW could have thought of using the proceeds from the IPO in different ways. The fact that the plaintiff decided to rely on the potential gain from the IPO in a particular way does not establish that she suffered a distinct injury. The plaintiff does not have an individual cause of action for breach of fiduciary duty against KBW. *See, e.g., Auguston v. Spry*, 282 A.D.2d 489, 723 N.Y.S.2d 103, 105–06 (2001) (dismissing breach of fiduciary duty claim based on misrepresentation by cor-

poration because the facts supported a shareholder's derivative action).

Therefore, the plaintiff's ninth cause of action for breach of fiduciary duty must also be dismissed.

## VI.

■ The defendants move to dismiss the plaintiff's tenth cause of action, which alleges negligence against KBW and McDermott. "To establish a prima facie case of negligence under New York law, three elements must be demonstrated: (1) the defendant owed the plaintiff a cognizable duty of care as a matter of law; (2) the defendant breached that duty; and (3) plaintiff suffered damage as a proximate result of that breach." *Curley v. AMR Corp.*, 153 F.3d 5, 13 (2d Cir.1998) (citations omitted). In New York, economic loss is not recoverable under a theory of negligence. *See, e.g., Asian Vegetable Research and Development Center v. Institute of Inter. Education*, 944 F.Supp. 1169, 1181 (S.D.N.Y.1996); *Niagara Mohawk Power Corp. v. Stone & Webster Eng'g Corp.*, 725 F.Supp. 656, 665 (N.D.N.Y.1989).

■ The plaintiff has failed to allege any cognizable duty of care that the defendants owed to her and which they breached. The plaintiff alleges that the defendants owed her a fiduciary duty as a shareholder, but that duty duplicates the plaintiff's ninth cause of action, which was dismissed. That would be a duty owed to the corporation for which only the corporation could sue. There is no basis for finding that McDermott owed any duty to the plaintiff in addition to the duty he generally owed to KBW shareholders as a board member of KBW. Moreover, the plaintiff only alleges that she suffered economic harm in the form of the loss of profits from an IPO. While she argues that she suffered anxiety because of her economic situ-

ation, the injury was indirect and does not fall within one of the circumstances under New York law allowing recovery for emotional harm. *See, e.g., Kennedy v. McKesson Co.*, 58 N.Y.2d 500, 462 N.Y.S.2d 421, 448 N.E.2d 1332, 1334–36 (1983).

Thus, the plaintiff's tenth cause of action must be dismissed.

## VII.

 Finally, the defendants move to dismiss the plaintiff's eleventh cause of action for breach of contract. The plaintiff asserts that she had an implied contract with KBW that provided for severance. "[A]n implied contractual relationship may be established by conduct of the parties, as well as by express agreement." *Mirchel v. RMJ Securities Corp.*, 205 A.D.2d 388, 613 N.Y.S.2d 876, 878 (1994) (citation omitted); *accord Jemzura v. Jemzura*, 36 N.Y.2d 496, 369 N.Y.S.2d 400, 330 N.E.2d 414, 420 (1975); *In the matter of Boice*, 226 A.D.2d 908, 640 N.Y.S.2d 681, 682 (1996). "An implied-in-fact contract requires such elements as consideration, mutual assent, legal capacity and legal subject matter." *Nadel v. Play–By–Play Toys & Novelties, Inc.*, 208 F.3d 368, 376 n. 5 (2d Cir.2000) (internal quotations and citation omitted).

▮ The plaintiff simply concludes that she had an implied contract with KBW to pay her severance. However, there is no allegation in the amended complaint of conduct by KBW that would indicate the presence of requisite elements for a contract such as consideration and mutual assent necessary to form an implied-in-fact contract.

Therefore, the plaintiff's eleventh cause of action must be dismissed.

## CONCLUSION

1. The defendants' motion to dismiss the plaintiff's first, second, third, eighth, ninth, tenth, eleventh causes of action is granted. However, because this is the first time that these claims have been dismissed and it cannot be said that the plaintiff can plead no set of facts to support such claims, these causes of action are dismissed without prejudice to repleading.

2. The defendants' motion to dismiss the plaintiff's fourth, fifth, sixth, and seventh causes of action is denied.

3. The plaintiff shall serve and file any amended complaint in conformity with this opinion within thirty (30) days.

**SO ORDERED.**