Joseph COONEY, Plaintiff,

v.

CONSOLIDATED EDISON, Defendant.

No. 00 Civ. 4965(JGK).

United States District Court,
S.D. New York.

Sept. 6, 2002.

Joseph Cooney, Bayside, NY, pro se.

### OPINION AND ORDER

KOELTL, District Judge.

The plaintiff, Joseph Cooney, brings this action pro se against his employer, Consolidated Edison Company of New York, Inc.

("Con Ed"). The plaintiff alleges that Con Ed discriminated against him on the basis of an alleged disability, namely Chronic Fatigue Immunity Dysfunctional Syndrome ("Chronic Fatigue Syndrome"), failed to provide him with reasonable accommodations for this condition, subjected him to discriminatory employment conditions, harassed and defamed him, and retaliated against him for filing complaints with the Equal Employment Opportunity Commission ("EEOC"), all in violation of the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12102 *et seq.* Construed liberally, the Complaint also contains a state law claim for defamation.

The defendant moves pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment dismissing the Complaint in its entirety. The plaintiff moves for additional discovery.

### I.

The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Gallo v. Prudential Residential Servs. Ltd. P'ship,* 22 F.3d 1219, 1223 (2d Cir. 1994). "The trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo,* 22 F.3d at 1224.

The moving party, Con Ed in this case, bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. The substantive law governing the case will determine those facts that are material and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining whether summary judgment is appropriate, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citing *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)); *see also Gallo,* 22 F.3d at 1223.

If the moving party meets its burden, the burden shifts to the nonmoving party, Mr. Cooney in this case, to come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). With respect to the issues on which summary judgment is sought, if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper. *See Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 37 (2d Cir.1994).

Finally, although the same standards for summary judgment apply when a pro se litigant is involved, the pro se litigant should be given special latitude in responding to a summary judgment motion. *See McPherson v. Coombe,* 174 F.3d 276, 279 (2d Cir.1999) (courts "read the pleadings of a pro se plaintiff liberally and interpret them 'to raise the strongest arguments that they suggest'") (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)); *see also Amaker v. Goord,* No.

98 Civ. 3634, 2002 WL 523371, at *2 (S.D.N.Y. Mar.29, 2002). The pro se party must also be given express notice of the consequences of failing to respond appropriately to a motion for summary judgment, unless the plaintiff's papers establish that the pro se litigant understood the nature and consequences of summary judgment. *See Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 620–21 (2d Cir.1999); *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir.1996); *Ruotolo v. IRS*, 28 F.3d 6, 8 (2d Cir.1994). In this case, by Notice to Pro Se Litigant Opposing Motion for Summary Judgment dated February 1, 2002, the plaintiff was advised of the procedures for responding to a motion for summary judgment, including the requirement to submit a response to the defendant's Rule 56.1 Statement and to submit counter-evidence. The plaintiff has submitted an appropriate response to the defendant's motion in this case, together with supporting affirmations.[1]

## II.

Unless otherwise indicated, the following facts are either undisputed or are matters of public record. The defendant Con Ed is a New York corporation that is engaged in the business of supplying electric, gas and steam services to the five boroughs of New York City and Westchester County. (Def.'s Rule 56.1 St. ¶¶ 1–2.) The plaintiff began working for the defendant in 1990 as a General Utility Worker, which is an entry-level position, in the Queens Gas Construction division ("Queens Gas Operations"). (Deposition of Joseph A. Cooney dated October 23, 2001 ("Cooney Dep.") at 64–65; Def.'s Rule 56.1 St. ¶ 6.) The plaintiff concedes that he was not disabled at the time. (Cooney Dep. 78.) During the course of his employment, the plaintiff re-

ceived training from the defendant in gas construction and repairs and on-the-job training covering gas construction and repair techniques and safety. (Cooney Dep. 65–66, 100–01; Def.'s Rule 56.1 St. ¶¶ 9–11.) The plaintiff was successively promoted until he was given the highest level mechanic's title, outplant Mechanic A in April 1994. (Cooney Dep. 86, 102–03; Def.'s Rule 56.1 St. ¶¶ 11–13.) This job involves a high degree of physical exertion. (Cooney Dep. 102–03, 117; Def.'s Rule 56.1 St. ¶ 4.) The plaintiff is currently a weekly union employee of Con Ed, working as an outplant Mechanic A in Gas Operations. (Def.'s Rule 56.1 St. ¶ 3.)

The plaintiff alleges that he was first diagnosed with the Epstein Barr virus, which causes him Chronic Fatigue Syndrome, in 1993, and that he began to seek certain accommodations in 1994 but ultimately declined to have any medical restrictions imposed on his work assignments because he did not want to lose the opportunity to work overtime. (Cooney Dep. 96–97, 107–12.)

On March 30, 1999, the plaintiff, who had been working at Queens Gas Operations, was suspended for thirty (30) days and was given a final warning and a transfer to Manhattan as discipline after an internal investigation resulting in a finding that he and his partner, Michael Senise, had harassed, intimidated and/or threatened a number of co-workers at the Queens Gas site. (Cooney Dep. 46–48; Def.'s Rule 56.1 St. ¶¶ 16–26.) Mr. Senise, who does not have any alleged disability, was terminated as a result of the findings in this investigation. (Cooney Dep. 47; Def.'s Rule 56.1 St. ¶ 26.) The plaintiff filed an EEOC Charge on March 31, 1999 claiming he was disciplined not for harass-

---

**1.** The plaintiff did not file anything that he called a Rule 56.1 Statement, but he did file reply papers and affidavits that make clear what his factual disagreements with the defendant's Rule 56.1 Statement are.

ing other workers but because he was disabled by Chronic Fatigue Syndrome and alcoholism, allegedly in violation of the ADA. (Affidavit of Jonathan A. Fields dated February 1, 2002 ("Fields Aff.") Ex. C.) On June 28, 1999, the EEOC issued a Dismissal and Notice of Rights with respect to this charge, and the plaintiff did not commence any federal action raising these claims. (Fields Aff. Ex. D; Cooney Dep. 9–10, 12.)

On May 12, 1999, the plaintiff completed his suspension and began working for Con Ed in Manhattan, under a different set of supervisors and managers. (Affidavit of Alfredia Sales–Fairnot sworn to January 25, 2002 ("Sales Aff.") ¶ 16.) Approximately two months later, in July 1999, the plaintiff alleges that he sought to be transferred back to Queens Gas Operations from Manhattan. (Cooney Dep. 88, 214.) The parties dispute whether the plaintiff ever submitted the appropriate documents to request such a transfer through the formal channels. (Cooney Dep. 94–95; *see generally also* Sales Aff. ¶ 26). The plaintiff was not transferred back to Queens. (Cooney Dep. 95.)

In October 1999, Rafael Morato, a supervisor in Manhattan Gas Operations who did not know the plaintiff and had never met him before, observed that the plaintiff appeared to be sleeping in a Con Ed truck at mid-morning near a job site. Morato questioned the plaintiff about his apparent sleeping, though the parties dispute what exactly was said during this conversation and whether the plaintiff had actually been sleeping. (Cooney Dep. 125–28; Def.'s Rule 56.1 St. ¶ 30.) On October 28, 1999, the plaintiff was given a disciplinary interview for "sleeping on the job" and "creating a poor public image" and received a five-day suspension and an extension of his all-inclusive final warning for one year from the date of the interview. (Sales Aff. Ex. G; Cooney Dep. 137, 151, 153–54.)

The plaintiff was told that because he was on an all-inclusive final warning, any future infractions would subject him to immediate discipline up to, and including, termination. (Sales Aff. Ex. G.)

In October 1999, a series of incidents of vandalism occurred at the College Point yard in Queens, which was one of the locations in which the plaintiff and Senise had worked and had allegedly harassed co-employees. (Cooney Dep. 274; Def.'s Rule 56.1 St. ¶ 38.) On October 29, 1999, a photograph posted on a bulletin board of two employees who had given statements against the plaintiff and Senise during the investigation that resulted in the plaintiff's discipline and Senise's termination was found defaced with the word "Rat" scratched on the photograph. (Affidavit of Terrence W. Cox sworn to January 30, 2002 ("Cox Aff.") ¶ 12.) In October and November 1999, the defendant conducted an internal investigation into these acts. (*Id.* ¶ 13.) The plaintiff alleges that the investigation was made in retaliation for his March 31, 1999 EEOC charge and was defamatory because the investigators inquired whether he or Senise had been seen at or near the College Point yard.

On November 12, 1999, the plaintiff filed a second EEOC charge, alleging disability discrimination and retaliation based on his October 28, 1999 suspension and final warning, the defendant's subsequent investigation into his activities, and its alleged failure to accommodate his request to be transferred back to Queens. (Fields Aff. Ex. E.)

On January 20, 2000, while the plaintiff was performing a gas repair, he made an error that resulted in the loss of gas service to hundreds of gas customers. (Cooney Dep. 139–44.) The plaintiff received a written warning on January 25, 2000 for "poor work performance" relating to this incident, and was told that if he had any

type of poor work performance thereafter, he would lose his job. (Sales Aff. ¶ 20 & Ex. H; Cooney Dep. 139, 148–51, 154–55.)

On February 16, 2000, the plaintiff used a wooden barricade rail with his truck bumper to push a steel road plate aside from a street excavation. (Sales Aff. ¶ 22 & Ex. J.) The wooden barricade rail shattered and speared the front of the plaintiff's utility truck, puncturing the grill and causing a leak and spill of fluid that interrupted work and resulted in the truck's being taken out of service. (Cooney Dep. 158–60, 178–79; Sales Aff. Ex. J.) The defendant claims that his supervisor on that project, Wilson Mejias, had told the plaintiff not to use this wooden barricade rail for this purpose, and that the plaintiff had received training that would indicate that such a use would be unsafe. The plaintiff disputes having been given this instruction and claims that there was no specific written policy forbidding this kind of use of a wooden barricade rail. (Cooney Dep. 158, 201.)

The plaintiff subsequently filed a claim for New York state unemployment insurance benefits. The claim was initially granted, (Cooney Dep. 225–26), but was later reversed by the Unemployment Insurance Appeals Board on the ground that the plaintiff had been discharged for insubordination and violation of work rules, which constituted misconduct. (Affidavit of Ross A. Rimicci sworn to January 31, 2002 ("Rimicci Aff.") Ex. L.) In May 2001, the New York State Supreme Court, Appellate Division, affirmed this ruling. (Rimicci Aff. Ex. M.) The plaintiff did not appeal this decision.

The plaintiff had also filed internal grievances relating to his suspensions, final warnings, progression denial, and ultimate termination of his employment. (Rimicci Aff. ¶ 21; Cooney Dep. 187.) The plaintiff's Union processed these grievances and proceeded to arbitrate them on the plaintiff's behalf. On March 17, 2001, an arbitration award was issued in which all discipline and suspensions were upheld except for the plaintiff's termination, which was reversed. (Rimicci Aff. Ex. J; Cooney Dep. 217.) No arguments of discrimination or retaliation were presented to the arbitrator. The arbitrator reversed the plaintiff's termination based on a finding that although Mejias had instructed the plaintiff not to use the wooden barricade rail and truck to push the steel plate during the incident leading to the plaintiff's termination, the plaintiff had not heard the instruction, such that the plaintiff had not engaged in actual insubordination. (*See* Cooney Dep. 206–08; Rimicci Aff. Ex. J at 19–22.) The plaintiff was subsequently reinstated with back pay and benefits. (Cooney Dep. 229–31.)

### III.

■ The first issue is whether to grant the plaintiff's motion for additional discovery. The plaintiff submitted this motion long after the close of discovery, and after the plaintiff had filed his response to the defendant's motion for summary judgment. Construed as an ordinary motion to compel, the motion is therefore untimely.

■ To the extent that the plaintiff seeks additional discovery to oppose the defendant's summary judgment motion pursuant to Rule 56(f), the plaintiff's motion must also be denied. It is well-established that a party resisting summary judgment on the ground that the party needs additional discovery in order to defeat a Rule 56(f) motion must submit an affidavit showing (1) what facts are sought to resist the motion and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts.

*Gurary v. Winehouse,* 190 F.3d 37, 43 (2d Cir.1999); *Amaker,* 2002 WL 523371, at *5. In this case, the plaintiff has not filed any appropriate Rule 56(f) Affirmation establishing these requirements. The plaintiff also seeks in part medical records that have already been produced to him. Hence, the plaintiff has failed to meet his burden for a Rule 56(f) motion, and the motion is denied.

## IV.

■ The defendant moves for summary judgment dismissing the plaintiff's ADA claims. Claims for discrimination and retaliation under the ADA are analyzed at the summary judgment stage under the *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) burden-shifting test. Under this test, the plaintiff must establish a prima facie case of discrimination or retaliation at the first stage. With regard to claims for discrimination, the plaintiff must show, more particularly, that: "(1) his employer is subject to the ADA; (2) he suffers from a disability within the meaning of the ADA; (3) he could perform the essential functions of his job with or without a reasonable accommodation; and (4) he was [discriminated against] because of his disability." *Reeves v. Johnson Controls World Srvs., Inc.,* 140 F.3d 144, 149–50 (2d Cir.1998); *see* 42 U.S.C. § 12112(a); *Ryan v. Grae & Rybicki, P.C.,* 135 F.3d 867, 869–70 (2d Cir.1998); *Usala v. Consol. Edison Co.,* 141 F.Supp.2d 373, 380 (S.D.N.Y.2001). To establish a prima facie case of retaliation, the plaintiff must show that he was (1) engaged in protected activity; that (2) the defendant was aware of this activity; and (3) the defendant took adverse action against the plaintiff; and (4) that a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action. *Reg'l Economic Cmty. Action Program,*

*Inc. v. City of Middletown,* 294 F.3d 35, 54 (2d Cir.2002).

■ If the plaintiff meets his initial burden, the burden shifts to the defendant to provide a legitimate nondiscriminatory or nonretaliatory reason for its decisions. *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *Heyman v. Queens Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Program, Inc.,* 198 F.3d 68, 72 (2d Cir.1999). If the defendant meets this burden, then the *McDonnell Douglas* framework disappears and the sole remaining issue is whether the plaintiff has produced sufficient evidence that discriminatory or retaliatory animus was a motivating factor in the challenged decisions. *Reg'l Economic,* 294 F.3d at 49, 54. In determining whether the plaintiff has met this burden, the Court is to use a "case by case" approach that evaluates "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports [or undermines] the employer's case." *James v. New York Racing Assoc.,* 233 F.3d 149, 156 (2d Cir.2000) (quoting *Reeves,* 530 U.S. at 148–49, 120 S.Ct. 2097); *accord Schnabel v. Abramson,* 232 F.3d 83, 90–91 (2d Cir.2000); *Dooner v. Keefe, Bruyette & Woods, Inc.,* 157 F.Supp.2d 265, 282–83 (S.D.N.Y.2001); *Alleyne v. Four Seasons Hotel,* No. 99 Civ. 3432, 2001 WL 135770, at *10 (S.D.N.Y. Feb.15, 2001), *aff'd,* 25 Fed.Appx. 74 (2d Cir.2002). "The task . . . is to examine the entire record and . . . make the case-specific assessment as to whether a finding of discrimination [or retaliation] may reasonably be made." *Zimmermann v. Assocs. First Capital Corp.,* 251 F.3d 376, 382 (2d Cir.2001).

## A.

The defendant moves for summary judgment on the plaintiff's discrimination

claims, first, on the ground that the plaintiff has not established that he was "disabled" within the meaning of the ADA. The ADA defines a "disability" with respect to an individual as:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such impairment; or

(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2). The plaintiff claims that he has Chronic Fatigue Syndrome, as a result of the Epstein Barr virus, which he claims is a "disability" under subsection (A) of this provision. In *Bragdon v. Abbott*, 524 U.S. 624, 631, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998), the Supreme Court set forth a three-part test for a "disability" under subsection (A) of the statute. First, the plaintiff must show that he suffers from a physical or mental impairment. Second, the plaintiff must show that the impairment affects a "major life activity." *Id.* at 631, 118 S.Ct. 2196. The Supreme Court has recently clarified that the major life activity must be "of central importance to most people's daily lives." *Toyota Motor Mfg. v. Williams*, 534 U.S. 184, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002). Third, the plaintiff must show that the physical or mental impairment "substantially limited the major life activity." *Bragdon*, 524 U.S. at 631, 118 S.Ct. 2196. "In order to be eligible to prevail upon a further showing of discrimination, a plaintiff must satisfy each of the three prongs." *Colwell v. Suffolk County Police Dep't*, 158 F.3d 635, 641 (2d Cir.1998).

■ Chronic Fatigue Syndrome can in principle constitute a "disability" under the ADA, if, under the test set forth in *Bragdon*, it is an impairment that substantially limits the person with the condition from engaging in major life activities. *See, e.g., Weixel v. Bd. Of Educ.*, 287 F.3d 138, 147–48 (2d Cir.2002) (allowing complaint to survive motion to dismiss when plaintiff claimed that Chronic Fatigue Syndrome substantially limited her ability to engage in the major life activities of walking, exerting herself and attending classes at school). In this case, however, while the plaintiff has produced evidence that he suffers from Chronic Fatigue Syndrome, he has not produced evidence indicating that the condition has substantially impaired his ability to engage in any particular major life activities. The plaintiff has not, for example, alleged that his condition prevents him from engaging in activities like walking, exerting himself or working. In fact, the plaintiff has made it clear that while the condition has caused him some hardships, it does not affect his ability to engage in the activities required for his present work, and he has testified that he is fully capable of engaging in this work, which involves a high amount of physical exertion. (*See* Cooney Dep. 118, 135–37.). Indeed, in March 2001, in connection with his reinstatement, the plaintiff completed a medical questionnaire in which he indicated that he had no physical limitations or restrictions that affected any of his activities at home or at work. (Affidavit of Lynne M. Hildebrand, sworn to Jan. 3, 2002 ("Hildebrand Aff.") Ex. G.) In these circumstances, there is no issue of material fact—the plaintiff is not disabled within the meaning of the ADA, and his claims for discrimination must be dismissed on this ground alone.

■ In any event, there is no evidence that the defendant took any of the adverse employment decisions against the plaintiff for anything other than nondiscriminatory reasons. The defendant has produced ample evidence that the plaintiff was disciplined on October 28, 1999 due to the fact that he was either sleeping or appeared to be sleeping on the job. The defendant has

similarly produced ample evidence that the plaintiff was disciplined on January 25, 2000 due to errors in his performance, and that he was disciplined and terminated on February 17, 2000 due to his misuse of the wood barricade rail. These are legitimate reasons for discipline, and the plaintiff has not argued that he did not commit the alleged errors or improprieties in question. The plaintiff offers explanations for his actions, such as the allegation that he did not hear any instruction from his supervisor, but the facts of what the plaintiff did support the nondiscriminatory reasons for the defendant's actions.

The plaintiff's contention that the defendant nevertheless engaged in these adverse employment decisions because of the plaintiff's alleged disability, rather than because of the plaintiff's errors or improprieties, is undercut by the fact that the plaintiff claims that the defendant knew of this condition since 1994, whereas each of the disciplines occurred shortly after the plaintiff committed the errors or improprieties in the workplace. With regard to the investigation in 2000, the defendant has produced evidence that some of the vandalism, including the scratching of the word "Rat" over pictures of two of the persons who had testified against the plaintiff and Senise in the 1999 investigation gave the defendant reason to question during the investigations whether any of the other employees had seen either him or Senise near the premises. The plaintiff was never charged with those acts.

Moreover, the plaintiff has produced no evidence that his alleged disability was a motivating factor for any of the adverse actions taken against him. There is no evidence that similarly situated persons without Chronic Fatigue Syndrome were treated differently, (*see, e.g.*, Cooney Dep. 125), and, in fact, the record shows that some employees, such as Senise, were treated even more severely after findings

of similar improprieties at work. The plaintiff had received a number of warnings and disciplines for prior conduct, and he was aware that Con Ed had a policy of allowing for termination for misconduct while on probation. (Cooney Dep. 137.) In these circumstances, the plaintiff cannot establish that the defendant engaged in any of the adverse employment decisions alleged because the plaintiff has Chronic Fatigue Syndrome. *See, e.g., James,* 233 F.3d at 156 (dismissing age discrimination claim because the evidence was insufficient to permit a reasonable trier of fact to find that age discrimination was reason for discharge); *Schnabel,* 232 F.3d at 90–91 (same); *Weinstock v. Columbia Univ.,* 224 F.3d 33, 49–50 (2d Cir.2000) (dismissing Title VII claim when no reasonable jury could conclude on the evidence that an adverse employment action was motivated by discrimination); *Dooner,* 157 F.Supp.2d at 282–83; *Alleyne,* 2001 WL 135770, at *10; *Anatsui v. Food Emporium,* No. 99 Civ. 1337, 2000 WL 1239068, at *7 (S.D.N.Y. Sep.1, 2000).

### B.

With regard to the plaintiff's claims for retaliation, the defendant moves for summary judgment on the ground that the plaintiff has failed to establish any causal nexus between the plaintiff's EEOC charges and the adverse actions. *See Reg'l Economic,* 294 F.3d at 53. Causation can be established indirectly, through circumstantial evidence, or directly by evidence of retaliatory animus. *See id.* at 53; *see also Manoharan v. Columbia Univ. College of Physicians & Surgeons,* 842 F.2d 590, 593 (2d Cir.1988). The timing of a defendant's conduct, such as where the protected activity was followed closely in time by adverse treatment in employment, may be circumstantial evidence of a retaliatory motive, though there is no bright-line rule for weighing the import of such

evidence. *Gorman–Bakos v. Cornell Co-op Extension*, 252 F.3d 545, 554–55 (2d Cir.2001) (collecting cases). Moreover, in cases where an employer's state of mind or motives are relevant, the materials before the Court must be carefully scrutinized for circumstantial evidence that could support an inference of retaliatory animus. *See, e.g., Rucci v. Thoubboron*, 68 F.Supp.2d 311, 318 (S.D.N.Y.1999) (citing *Chertkova v. Connecticut Gen. Life Ins. Co.*, 92 F.3d 81, 87 (2d Cir.1996)).

▇▇▇ In this case, the plaintiff makes a number of conclusory allegations of retaliatory animus but provides no direct evidence of such a motive. As discussed above, the defendant has provided legitimate non-retaliatory reasons for each of the actions that the plaintiff challenges, and the plaintiff has not argued that the reasons stated did not exist. He claims only that the defendant was not in fact motivated by these reasons alone and that his EEOC charges played a substantial role in the adverse employment actions. As discussed above, however, each of the allegedly adverse actions occurred shortly after the plaintiff engaged in some error at the workplace, and the plaintiff has produced no evidence that the responses were any different than Con Ed's responses to similarly situated employees who had engaged in similar errors or improprieties.

Moreover, the employment decisions that the plaintiff complains of were not made by the same supervisors that he complained of in his March 1999 EEOC charge. All but the last two disciplinary actions occurred before he filed his second November 1999 EEOC charge, and, hence, could not have been caused by that protected activity. The adverse actions occurring after the November 1999 EEOC charge occurred only after the plaintiff had been issued final warnings relating to his performance and had been disciplined a number of times due to his performance

and conduct, and the plaintiff does not allege that this progressive discipline was in any way inconsistent with Con Ed policies for similar kinds of conduct with similar histories of discipline. *See, e.g., Greenbaum v. Svenska Handelsbanken*, 67 F.Supp.2d 228, 251–52 (S.D.N.Y.1999) (evidence of deviations from policy or practice in employment decisions with respect to a plaintiff can, in the appropriate circumstances, indicate discriminatory motive).

In these circumstances, no reasonable juror could find that the plaintiff has produced sufficient evidence of retaliatory animus to raise a material issue of fact with regard to his retaliation claims, and the defendant is therefore entitled to summary judgment on this claim. *See, e.g., James*, 233 F.3d at 156; *Schnabel*, 232 F.3d at 90–91; *Weinstock*, 224 F.3d at 49–50; *Dooner*, 157 F.Supp.2d at 282–83; *Alleyne*, 2001 WL 135770, at \*10; *Anatsui*, 2000 WL 1239068, at \*7.

### C.

The plaintiff argues that the defendant failed to provide him with a reasonable accommodation for his Chronic Fatigue Syndrome by failing to transfer him back to the Queens Gas Operations. It is unclear whether the plaintiff ever made a formal request for a transfer. In any event, a plaintiff seeking such an accommodation under the ADA bears the burden of showing that he is a "qualified individual with a disability," 42 U.S.C. § 12111(8), and, for the reasons discussed above, the plaintiff did not suffer from any "disability" under the ADA. This provides an initial independent and adequate ground to dismiss the plaintiff's claim for reasonable accommodations.

▇▇▇▇ In any event, a plaintiff seeking a "reasonable accommodation" also bears the burden of establishing that an accommodation exists that permits the

plaintiff to perform the job's essential functions; if the plaintiff meets that burden, the defendant bears the burden of persuasion of showing that the proposed accommodation is not reasonable. *See Jackan v. New York State Dep't of Labor,* 205 F.3d 562, 566 (2d Cir.2000). In this case, the plaintiff has not met his burden of identifying a vacant position in Queens. *Id.* at 567–68. Moreover, the accommodation that the plaintiff seeks is not reasonable. The plaintiff requested to be transferred back to the Queens Gas Operations ·only a couple of months after he had been transferred away from that department due to a finding that he had harassed and/or verbally abused and intimidated a number of co-employees at that very division.[2] At the same time, the tasks that he would have to perform at the Queens Gas Operations are substantially similar to the ones he performs in Manhattan, and the plaintiff has produced no evidence indicating why this transfer would help accommodate his Chronic Fatigue Syndrome while at work. Indeed, the plaintiff has consistently claimed that he can perform all of the functions of his present job, (*see* Cooney Dep. 118, 135–36), and, when he was allowed back to his position in Manhattan, he filled out forms indicating that he had no medical disabilities that would interfere with his ability to perform in this job. (Hildebrand Aff. Ex. G.) The plaintiff has also declined to limit his work in other ways that might ordinarily be thought to accommodate a condition like Chronic Fatigue Syndrome, refusing, for example, to take less overtime work and refusing to identify any other reasonable accommodations. (Cooney Dep. 107–09.) The plain-

tiff's only argument is that a transfer to Queens would reduce his commute time and make his work less stressful, (Cooney Dep. 89, 218), but, given the plaintiff's history at the Queens Department and his failure to suggest or accept other accommodations that might allow him to handle better his Chronic Fatigue Syndrome from Manhattan, the plaintiff has not sought a reasonable accommodation for his condition. This provides a second independent and adequate ground to dismiss the plaintiff's claim for reasonable accommodations.

## V.

■ The Complaint uses some language indicating that the plaintiff seeks to raise a claim for harassment or hostile work environment under the ADA. The plaintiff's second EEOC Complaint is not explicit about such a claim but does contain some language relating to harassment. To the extent that the plaintiff seeks to raise a hostile work environment claim, the plaintiff would have to establish, as one element of such a claim, that he was the victim of harassment because of a disability; this claim therefore suffers from the same inability on the part of the plaintiff to establish a disability within the meaning of the ADA, which has undermined his other ADA claims. *See, e.g., Disanto v. McGraw–Hill, Inc.,* 97 Civ. 1090, 1998 WL 474136, at *5 (S.D.N.Y. Aug.11, 1988) (collecting cases that analyze ADA hostile work environment claims under the same standards applicable to Title VII hostile work environment claims, such that any actionable intimidation, ridicule or harassment must be based on a plaintiff's disabil-

**2.** In his first EEOC charge, the plaintiff alleged that he was actually transferred on discriminatory grounds due to his alleged disability, but the EEOC terminated this charge with a Notice of Dismissal and the plaintiff did not bring any timely action in federal court raising these claims. The plaintiff's present claims are limited to the charges in his second EEOC charge, and, to the extent that the plaintiff seeks to revive his challenge to his transfer under the guise of a claim for reasonable accommodations, this claim is untimely. *See, e.g., Usala,* 141 F.Supp.2d at 379.

ity) *aff'd*, 220 F.3d 61 (2000). For the reasons discussed above, the plaintiff has also failed to establish that the adverse actions complained of above were motivated by any illicit discriminatory or retaliatory animus. The plaintiff also failed to offer any evidence that the workplace was permeated with "discriminatory intimidation, ridicule, and insult" that was "sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 61 (2d Cir.1998) (internal quotation marks omitted) (defining requirements for a hostile work environment claim).

In any event, in support of his claim for harassment on this motion, the plaintiff offers primarily affidavits from two other employees who have no claimed disabilities and who testify that they were also harassed by a supervisor at Con Ed who allegedly harassed the plaintiff. (*See* Affidavit of Warren Weekes signed February 21, 2002; Affidavit of Robert Reyes signed February 21, 2002.) Because this alleged harassment was not on the basis of any disability, this is not the kind of harassment that is actionable under the ADA. If anything, the plaintiff's use of these affidavits as the primary evidence in support of his claim indicates that the kind of harassment the plaintiff is alleging is similarly not actionable under the ADA.

In sum, the plaintiff has not presented any evidence that he was harassed or subjected to a hostile work environment in violation of the ADA, and any such claim must be dismissed. At argument, the plaintiff made it clear that the gist of his claim was alleged retaliation rather than a hostile work environment claim. (Tr. of July 22, 2002 ("Tr.") at 15–16).

## VI.

In his final brief on this motion, and in a subsequent letter to the Court dated Au-gust 7, 2002, the plaintiff raises a number of new allegations that are not part of his Complaint and that involve events that occurred after the close of discovery in this case. The defendant complains, first, that the defendant made a request for volunteers in Westchester in April 2002, which was allegedly not communicated to the plaintiff, and that the plaintiff was ultimately placed in the Eastview yard rather than the Rye yard, where he would have preferred to have been placed. The plaintiff complains, second, that he has faced difficulties obtaining a flexible work schedule after he began working in Westchester in April 2002.

These claims are not part of the present action. The plaintiff may bring a separate action raising these claims, but discovery is now closed in this case. A party may not raise new claims for the first time in response to a motion for summary judgment. The parties indicated at oral argument that the plaintiff has in fact raised his complaints relating to Westchester in a separate proceeding before the EEOC. *See* Tr. at 18–19. Because exhaustion of administrative remedies is a prerequisite to suit under the ADA, the Court would lack jurisdiction to hear these claims at this time in any event. *See, e.g., Jacques v. DiMarzio, Inc.*, 216 F.Supp.2d 139, 143–44 (E.D.N.Y.2002); *Joseph v. Am. Works, Inc.*, No. 01 Civ. 8287, 2002 WL 1033833, at *5 (S.D.N.Y. May 21, 2002); *Glozman v. Retail, Wholesale & Chain Store Food Employees Union*, 204 F.Supp.2d 615, 629–30 (S.D.N.Y.2002); *see also* 42 U.S.C. § 12117(a) (incorporating into the ADA, by reference, Title VII's enforcement scheme, codified at 42 U.S.C. § 2000e–5(e)(1), which requires exhaustion of administrative remedies). For all of these reasons, this Opinion and Order does not address any of the new claims that the plaintiff has identified in his recent sub-

missions, and which are not part of this case.

## VII.

■ Liberally construed, the plaintiff's Complaint may also raise a claim for defamation under New York state law. Having dismissed all of the federal claims in this action, there is no longer any federal question jurisdiction in this case. The Complaint also does not alleged diversity jurisdiction pursuant to 28 U.S.C. § 1332, and diversity appears to be lacking from the face of the Complaint. This case has not yet proceeded to trial, and it presents no other exceptional circumstances that might warrant maintaining jurisdiction over the state law cause of action. In these circumstances, the Court should decline to exercise supplemental jurisdiction over any state law claim for defamation that the plaintiff may be seeking to raise, and any such claim should be dismissed for lack of jurisdiction. See 28 U.S.C. § 1367(c)(3); *Giordano v. City of New York,* 274 F.3d 740, 754 (2d Cir.2001); *Morse v. University of Vermont,* 973 F.2d 122, 128 (2d Cir.1992); *DeVito v. Incorporated Vill. of Valley Stream,* 991 F.Supp. 137, 145 (E.D.N.Y.1998); *Irish Lesbian and Gay Organization v. Bratton,* 882 F.Supp. 315, 319 (S.D.N.Y.1995), *aff'd,* 52 F.3d 311 (2d Cir.1995); *Lieberman v. Fine, Olin & Anderman, P.C.,* No. 00 Civ. 6533, 2002 WL 142198, at *4 (S.D.N.Y. Jan.31, 2002).

## CONCLUSION

For the foregoing reasons, the plaintiff's motion for additional discovery is denied. The defendant's motion for summary judgment dismissing the Complaint is granted. Any claim for defamation is dismissed without prejudice. The Court has considered all of the arguments of the parties and to the extent not specifically addressed, the arguments are either moot or without merit. The Clerk of the Court is directed to enter judgment and to close this case.

**SO ORDERED.**